Christian, J.
This cause is before us upon an appeal allowed to a decree of the Circuit court of Frederick county. A statement of the following facts is necessary to a proper understanding of the case, and the application of the principles of law which must govern it.
On the 2d day of June 1858, James 1L Hite, Sr., sold to his two sons, J. Irvine Hite and J. Madison Hite, his farm, lying in Clarke county, containing about seven hundred acres, for the sum of §45 per acre. One-eighth of the purchase money was to be paid on the 1st day of January 1859, and one-eighth annually thereafter, until one moiety should be paid; one-eighth of the other moiety was to be paid at the death of the wife of the said James M. Hite, Sr.; and one-eighth annually thereafter, until the whole should be paid, when the purchasers were to have a deed for the land; the interest on the whole amount to he paid annually, from the 1st day of January 1859.
Hite died in the latter part of the year 1859, having made and published his last will and testament, which was duly admitted to probate and record in the County court of Frederick county. By this will the sum of' five thousand dollars was directed to he applied to the *510 support of the testator’s wife (then and now an inmate of the Lunatic Asylum at Staunton), and subject to this provision—all of his property was to be divided equally between three of his children, viz: J. Madison Hite, Ann Eliza Stinker, wife of T. J. Skinker, and Caroline, wife of Alexander Baker, whose share was devised in trust to her brother, the said J. Madison Hite, and the executor was authorized to make a deed to his sons, the purchasers of the said land, after the death of the testator’s wife, and when the entire purchase money should have been paid. Philip "Williams, of Winchester, a lawyer of eminence‘and large experience, was constituted the executor of this will.
In November 1859, the two sons of the testator, who had become the joint owners of the land under the purchase referred to, by agreement between themselves, appointed certain persons to make an equal division of the land between them, and, in January 1860, executed a deed of partition, whereby they conveyed in severalty to each other the portions which had been respectively allotted to them in said division.
At the death of the testator between two and three thousand dollars had been paid on account of the purchase money for the land. The whole balance amounting, at the death of the testator, to the sum of nearly thirty thousand dollars, remained unpaid, and for that balance the land stood as security for its payment; for, by the terms of the contract of sale, the title was to be withheld until the whole of the purchase money was paid. The debts of the estate were ■so inconsiderable that it was not necessary to collect any part of this fund for the payment of the testator’s debts.
The great bulk, if not the whole of the testator’s -estate, consisted of this fund in the hands of his two *511 sons, due on account of the land, and for which the land was bound as security for its payment. By the provisions of the will of James M. Hite, Sr., this fund was to be equally divided between J. Madison Hite, Caroline Baker and Ann Eliza Skinker, three of the ■children, and the sole devisees of the testator.
In October or November of the year 1862, Irvine Hite having received what he considered an advantageous offer for the portion of the land allotted to him, in the division between himself and his brother, applied to the executor to know whether he would receive Confederate money for the debt due from him to his father’s estate.
The executor, after communicating with James M. Hite, and obtaining his assent in his own right, and as trustee for Mrs. Baker, to receive that currency in payment of their legacies, and after making an ineffectual attempt to obtain the assent of Skinker and wife, agreed with Irvine Hite that he would receive Confedérate money in payment of the debt he owed to his father’s estate. Accordingly, on the 24th day of November 1862, the sum of $19,234.12 (that being the price agreed upon between Irvine Hite and Wood, the purchaser of the land,) was paid to the executor in Confederate treasury notes, and a deed executed on that day by Hite and wife, and the executor, Williams, was delivered to Wood.
Out of this fund, thus received, the executor paid over to J. Madison Hite, in his own right and as trustee for Mrs. Baker, the respective proportions due them as the devisees and legatees of his testator. The proportion due to Mrs. Skinker remained in his hands, and failing to hear from Skinker, who was in the army, or Mrs. Skinker, who was in a distant part of the state, and for a long time within the lines of the *512 Federal army, the executor invested the fund in seven per cent. Confederate bonds. Whether this investment was made in the name of the executor, or in the name of Skinker and wife, does not appear, nor, in my view of the case, is it material to be knowu.
Thus matters stood until after the close of the war, when, in February 1866, Skinker and wife' filed their bill in the Circuit court of Frederick against the executor and legatees of James M. Hite, Sr., Irvine Hite» and the purchaser of the land from him, in which they claim that they are entitled to one-third of the estate of James M. Hite, after payment of his debts; that this legacy to Mrs. Skinker was secured by a lien upon valuable real estate; that they have never received any part of that legacy thus secured; that they had never executed any transfer, release or acquittance for the'same, or any part thereof; nor given any consent or sanction, or done any other act tending to impair their right to the legacy, or any lien for the same; and they ask for such decree as may be necessary for payment of whatever sum may be justly due them, and for enforcing the same by sale of the lands or otherwise.
To this bill the defendants all answered. The only answer necessary to be noticed is that of the executor, Williams, which will be more particularly referred to presently. After the answers of all the defendants were in the cause, the executor filed a cross-bill by leave of the court, which he denominates a cross-bill for discovery, in which he charges that Skinker and wife knew of the sale made by Irvine Hite to Charles Wood as early as 1868, and neither of them informed said Williams, the executor, of their dissent or opposition to said sale; that said Thomas J. Skinker passed through Winchester, where executor resided, some *513 time in 1863, and never called upon him, or gave him any information as to his objecting to said sale; and calls upon them to answer when they or either of them were informed of the sale made by Hite to Wood for Confederate money; and whether they or either of them ever informed the executor that they objected to the sale or the terms thereof; whether Thomas J. Skinker passed through Winchester in the year 1863; and when, and whether he made any communication of any kind in relation to said sale until after the surrender of General Lee’s army.
To this cross-bill Skinker and wife answered, that Mrs. Skinker heard of the sale from Irvine Hite to Wood as early as Hovember 1862, but had no communication with Mr. Williams, the executor, on the subject; that Thomas Skinker heard of the sale at the same time, but was in the federal lines, and could make no answer to Mr. Williams’ letter on the subject for want of mail facilities; that Thomas J. Skinker was a prisoner in Washington for some time in the spring of 1863, and was in a very critical state of health during the greater part of th'e war from a serious wound and other causes; that he did pass through Winchester just after the battle of Gettysburg, under military orders not to leave the ranks, and a few days thereafter returned from Williamsport through Winchester on the Sabbath, prostrated from sickness, and was ordered immediately to a hospital at Staunton. Such was the nature of the cross-bill and the answer thereto.
Depositions of numerous witnesses were taken to show that at the period when the land was sold by Irvine Hite, and at the time the Confederate money was received by the executor, that currency was the only currency in circulation, and that it was received *514 in payment of 'debts generally, and that land was bought and sold for that currency.
In September, 1868, the case came on to be heard upon the bill and answers, the cross-bill for discovery and answer thereto, and the depositions of witnesses, and the court reserving certain questions for future adjudication, decreed “that the defendants, John J. and James H. Williams, administrators with the will annexed of Philip Williams, deceased, out'of the assets of said testator, in their hands, do pay to the complainants (Skinker and wife) the sum of four thousand nine hundred and eighty-nine dollars and fifty-five cents, with interest thereon at the rate of six per centum per annum, from the 24th day of November, 1862, until paid, and when paid, to be a credit pro tanto upon the executorial account of James M. Hite’s estate.” It is from this decree that an appeal has been allowed to this court.
The grave and important questions arising in this case (in the form in which they are presented here) are now before this court for the first time. In the numerous and multifarious cases growing out of dealings in Confederate currency, and contracts made with reference to that currency, the question has not yet been definitively adjudicated as to how far or under what circumstances an executor may be 'excused or justified in receiving a depreciated currency for a gold debt, well secured, without incurring a liability for a devastavit. This question we have to meet for the first time in this case. I do not deem it necessary, for the purpose of my conclusions, to refer to matters put in issue by the pleadings, or to the disputed facts. I shall ground my opinion upon the conceded facts in the cause, and upon those only. What are those facts ? It must be conceded—1st. That Mrs. Skinker is entitled, *515 under the will of James M. Hite, Sr., to one-third part of his whole estate, subject, first, to the payment of his debts, and to the appropriation of $5,000 for the support of his insane wife. 2d. That the legacy to Mrs. Skinker was secured by a lien upon valuable real estate. 8d. That Skinker and wife have never executed any release, transfer or acquittance for this legacy, and have never given their assent or sanction, or done any other act tending to impair their right to their legacy, or any lien existing to secure its payment. 4th. That they have never, through themselves or their agents, received one dollar of this legacy, and never authorized the executor or any one else to receive for them any portion of the same in Confederate treasury notes, or to make an investment for them in Confederate bonds. 5th. That it was not necessary to collect the debt due from Irvine Hite to the estate of James M. Hite, for the purpose of paying debts of the estate, for no such debts were outstanding against the estate, all had been paid, and Irvine Hite’s debt was in fact due to the legatees: they were entitled to receive it through the hands of the executor, and he had no occasion to collect the fund except for the purpose of paying it over to them.
These are the undisputed and conceded facts in the cause; and the question arises upon these facts, whether the executor receiving this debt, well secured upon real estate, in a currency depreciated to nearly one-half its nominal value, without the consent of the legatee to whom it was to be paid, has incurred a responsibility for which he is personally liable; in other words, whether to the extent of receiving the proportion of the debt due to Mrs. Skinker, without her consent, he has committed a devastavit. It must be conceded also that no man knew better than Mr. *516 Williams, the executor, that he had no authority as executor, to collect the debt due from Irvine Hite in Confederate currency, unless (there being no debts of the estate) the heirs and legatees would agree to receive it from him. He was a lawyer of large experience and eminent in his profession, and must be presumed to understand his duties and liabilities as an executor. But the following letter, filed in the record, shows that he well knew and fully understood his obligations to the estate and to the legatees. It is addressed to James M. Hite, himself one of the legatees, and is ip the following words: “ Irvine can make sale of his land in Confederate money to Charles Wood for a sum sufficient to pay all that is due from him to the estate. But as I am acting only as executor it would, not be proper for me to receive Confederate money unless the heirs will take it from me. I would advise them to take it. Will you be good enough to let me know whether you will receive Mrs. Baker’s share in Confederate money. It will be well, I think, to invest it in Confederate - bonds. Let me know immediately, as it is important to the estate and to you that the sale should be made.”
The result of this communication was that the executor obtained the consent of two of the legatees to receive their proportion of the legacies due them in Confederate money. But he never did obtain the consent of Skinker and wife; and after waiting for some time and making ineffectual attempts to get their consent, he deliberately took upon himself the responsibility of receiving it without their consent. He knew that in doing this he was incurring the risk of a refusal upon the part of Skinker and wife, and he sought to protect himself against that risk (in receiving Confederate money for them without their consent) by taking *517 as indemnity from Hite the sum of upwards of four thousand dollars over and above their share of the fund collected. In making this statement I only give the executor’s own account of the transaction. Let him speak for himself. In his answer he says (after stating that he obtained the- consent of two of the legatees to a sale of the land in Confederate money): “The complainant, Thomas J. Skinker was then in the Confedei’ate army, and after waiting for a time to see or hear from him or his wife, but without success, said J. I. Hite, was so anxious to conclude the sale with Wood and pay off his debt, stating, aa well as respondent recollects, that he could never pay the debt without selling, a'nd if he did not sell then, that the interest accruing might so increase the debt that the land would not pay it, an opinion in which respondent concurred, that if he would unite in the deed to Wood, and receive the Confederate money in payment of his debt, that he would leave an excess of $4,100 or $4,200 in the hands of respondent to indemnify him; and if Skinker and wife require it, to pay so much or all of that excess to them over and above their equal share. He expressed the confident opinion that complainant would assent, in which respondent concurred; and said Hite agreed that he would endeavor to see complainants as soon as possible and get their consent to the arrangement; and l’espondent said he would also endeavor to communicate with them to obtain their written consent. Under these fads respondent agreed to receive the money and unite in the deed as executor, &e.”
It is manifest, therefore, both from the answer of the executor, as well as from the letter addressed to -James M. Hite, above quoted, that he was convinced that, in his own language, “ it was not proper for him to re *518 ceive as executor the Confederate money, unless the heirs would consent to receive it from him.” Two of them having received it, he no doubt believed that the third (Mrs. Skinker) would also receive it. But he deliberately took upon himself the responsibility of receiving her share without her consent, feeling, it is evident, at the time satisfied that he would be fully indemnified for any risk he might assume in having in his possession upwards of four thousand dollars more than her share of the fund. Can he now be relieved of a responsibility which he deliberately assumed, and throw the loss upon the legatees, whose assent to these transactions the executor himself thought necessary, but vainly sought to obtain ? I think not. I think it is clear that without imputing any mala Jides, or intentional fraud to the executor, he has committed a devastavit to the extent of the amount which he received in Confederate money, without the consent of the legatees who were entitled to receive it.
It is not necessary, in order to subject an executor to personal liability, to show that he acted fraudulently. He is subjected by law to liability, personally, for various acts of misconduct, amounting to a violation or neglect of duty, and which is called in law a devastavit, or wasting of the assets. An executor may commit a devastavit by such acts of negligence or careless administration as defeats the rights of creditors, or legatees, or parties entitled to distribution. 2 Lomax’s ex’ors 475-77-485, and cases there cited.
It is a proposition too plain to require the citation of authority to support it, that where an executor releases a debt due to his testator, or cancels or delivers to the obligor a bond, of which the testator was obligee, this will charge him to the amount of the debt; and so if he releases a part of the debt, or can *519 cels, or delivers up the whole obligation, when, in point of fact, he has received but a part of it, he commits a devastavit, and will be charged with the whole, though he received but a part. In the case before us, the executor in fact received a little more than half the debt, and gave an acquittance for the whole, and that too when the necessities of the estate did not require it, and without the consent of one of the legatees entitled to receive it. I do not mean to say that in every case where an executor received Confederate currency greatly depreciated, for a debt payable in a sound currency, he thereby commits a devastavit. There may be many cases where the courts would hold an executor justified in receiving such a currency; as where the necessities of the estate required it, where it could be used in payment of the debts of the testator, or where (there being no debts) the parties entitled to distribution consent to receive it, or where the security for the debt had become doubtful, and the estate could be benefited bjr receiving even a depreciated currency. It is difficult to lay down any general rules applicable to all cases which arise out of dealings by executors during the war. Each case must depend upon its own facts and the circumstances at the time surrounding the executor. But I think it is clear that where the exigencies of the estate do not require the collection of a debt, which rests upon undoubted security, and especially where the only object of the collection is for distribution among the legatees, and the collection is made without the consent of the legatees, the executor must be held personally liable when he permits the debtor to discharge his debt in a depreciated currency, and he will not be permitted to shift the responsibility from himself and cast the burden of loss upon the legatees. An execu *520 tor, who receives a depreciated currency under such circumstances, commits a devastavit, for which the law casts upon him a personal liability.
The able counsel for the appellants seeking to relieve the executor in this cause, from the stress of those well settled rules of law which declare what constitutes a devastavit, and fixes a personal liability upon an executor, labored to show that the executor in receiving from Irvine Hite Confederate currency, benefited the estate, because the security for the debt was doubtful, inasmuch as the .debts due from Madison ■ and Irvine Hite exceeded the value of the land. They submit a statement in figures, by which they show that the debt secured by lien on the land amounted to $32,728.27, while the value of the land (after deducting a small portion sold to Bowen) was $31,644.03; showing an excess of debt over value of land of $1,084.24. And it is argued that while the debt was increasing by the accumulated interest, the land was [subject to be greatly'depreciated by the fact that it lay within a region much exposed to the casualties of war and the depredations of contending armies; and that the buildings, fences and timber were in constant danger of destruction; and that therefore the security for the debt was doubtful, and the executor was justified in collecting it in a depreciated currency. It is a sufficient answer to this view to note the fact that one-third of the debts secured upon the real estate, went, under the will, to J. M. Hite, and that in point of fact the amount due the estate, which the executor was charged with collecting, was only two-thirds of the amount estimated as the debt secured on the land, to wit: the sum of $21,818.84; so that in point of fact, there was a debt of $21,818.84 secured by lien on land worth at least $31,644.03; *521 thus leaving a balance of nearly $10,Q00 over and above the debt which was to be paid. I think, therefore, it must be conceded that the land was the most ample and certain security for the debt.
But it is insisted by the learned counsel for the appellants that the executor acted in good faith, himself believing that it was best for the estate, and those entitled to • distribution, that the debt should be collected; and that upon the principles settled by this court in Davis, comm’r v. Harman and in Myers’ ex’or v. Zetelle, 21 Gratt. 194, 733, he ought to be excused from all liability. As has been observed before, the question how far, or under what circumstances an executor may be excused or justified in receiving Confederate money, greatly depreciated, for a gold debt well secured upon real estate, without incurring liability for a devastavit has never been settled by this court. Nor is it necessary to charge an executor for a devastavit to show that he has acted fraudulently, or shown mala jides in his administration of the estate. The cases relied upon involved very different questions from the case at bar. In the one case, Davis v. Harman, a commissioner of the court who had in his hands certain funds, claimed by contesting parties, was directed to hold the fund until the rights of the parties could be litigated. He put the fund in bank and there it perished, not in consequence of the deposit, but in consequence of “the sudden and irretrievable destruction of the whole currency of the country by the termination of a civil war, which had destroyed the very power that created it.” The court held that the commissioner had incurred no personal liability.
The case of Myers v. Zetelle, 21 Gratt. 733, rested upon the peculiar facts of that case. The pivotal *522 point of that case was the power of attorney under which the agents acted, conferring upon them the amplest power and the largest discretion. They were clothed with authority to sell his real estate, and to collect his debts, whether due or not due. They collected a debt, it is true, which was not due, and which was secured by a lien upon a house in the city of Richmond, and this court held that, under the peculiar circumstances of that case, the agents could not be held liable. This point in that case is pressed in argument here as conclusive of the position that the executor in this case ought not to be held liable. But, in my view, the cases rest upon totally different grounds. In the' first place, the agents in the case of Myers v. Zetelle, were clothed with the undoubted authority to do what they did do by the very terms of the power of attorney; and the only question was, whether in the exercise of a full discretion, voluntarily conferred upon them by their principal, they acted with such a reckless disregard of their obligations as to impose on them a legal liability for their conduct. Referring to that case upon this point, I find that after noting the fact that they had the undoubted authority, under the power of attorney, to collect thiB debt, and referring to the circumstances-which then surrounded the agents, the court used the' following language: “The city of Richmond was threatened, if not actually invested, by powerful armies from different points. They had every reason to believe that the city would be bombarded and burnt if taken. The security for the debt of Pizzini was the house which was mortgaged to secure the debt. If that was burnt, it was doubtful if the debt could be made.
“ The evacuation of Richmond was an event that *523 might be expected any day. They had no reason to suppose that the evacuation of the city would he followed by the surrender of the Southern armies, but that the war might still continue, and the Southern cause yet be triumphant, and that the best security they could have would be the bonds of the Confederacy. With this belief, and under these circumstances, they received the debt of Pizzini. Looking back upon these events from our standpoint, we may say it was an act of folly upon the part of these agents to collect this debt so well secured; but can we say, under the circumstances which then existed, they acted with such reckless disregard of their obligations as to impose on them a legal liability for their conduct. All we can say is, that as events have transpired, it would have been better if they had not collected this debt; but can we say that, under all the circumstances, they were guilty of a breach of trust and violation of duty. It is easy to conclude now that a deed of trust upon a house in the city of Richmond was better security for a debt of five thousand dollars than a bond of the Confederate States. But when that city is threatened by beleaguring armies with bombardment and fire, we may conclude that a man at least acted honorably and in good faith, who, having unwavering confidence in the triumph of the southern cause, preferred a bond of the Confederate States as better security than property thus threatened with destruction. * * * *
‘iBut let it be conceded that these agents did commit errorB of judgment; that, by a different course, they might have saved a large portion of their principal’s estate from the wreck and ruin of the war; that if they had not sold his real estate that would have escaped the hazards of sequestration as well as the fires-which did at last consume a large portion of the city;. *524 that the debt of Pizzini, if they had let it remain till due, would have been also saved to their principal: Admit all this, and yet in the absence of any proof of fraud or malafides, upon the well settled principles of courts of equity they cannot be held liable for the loss their principal has suffered—that loss must fall on him and not on them.”
I have extracted this much from the opinion in Myers v. Zetelle for the purpose of showing the exact grounds upon which this court, in that case, relieved the agents from personal liability. In the first place, they had the undoubted authority to collect the Pizzini debt, though not due, by the express terms of the power of attorney. In the second place, they had the best reasons to believe, and did honestly believe, that the security (being a house in a city which was the objective point of all the operations of the Federal armies) was threatened with destruction. How, in the case before us, while, as a matter of course, the executor has the general power to collect the debts due his testator, he certainly has no right to release a debt, or to discharge a debtor of undoubted solvency from his whole obligation by receiving a part of it. He has no authority to receive in a depreciated currency a debt payable in gold and well secured upon real estate ample in value to make it perfectly safe, unless the exigencies of the estate require it; or, where there are no debts (as in this case), those who are entitled to distribution consent to receive it. In Myers v. Zetelle the agents had the express authority to collect Confederate money, for that money was in circulation at the time the power of attorney was executed, and was very soon afterwards the only circulating medium. Again, in the case 'before us the security for the debt was not a house in a city threatened with destruction, *525 a large portion of which was actually consumed by fire upon being captured, but it was a large tract of land in the country, upon which there were no buildings to be destroyed, and which could not be so materially injured by the ravages of war as to seriously impair the security.
The two cases differ, therefore, in these two essential particulars. In the one case the authority to collect the debt was conceded; in the other, the executor himself admits, in writing, that “it would not be proper for him, as executor, to receive Confederate money, unless the heirs would agree to take it from him.” In the one case the security was, to say the least, doubtful; in the other it was ample and could not be destroyed.
But it is argued that the executor ought to be relieved because a majority of the heirs agreed to receive Confederate money. Surely, the consent of two of the heirs cannot affect the rights of the other one, who never gave her assent, but purposely withheld it. It was manifestly to the interest of James M. Hite, in his own right, and as trustee for Mrs. Baker, to give his assent to the arrangement proposed, to sell the land for Confederate money, and to receive that currency in payment of their legacies, for every dollar that was received from Irvine Hite to that extent relieved the land of James M. Hite from the lien fixed upon it by the will of his father for the payment of the purchase money. The interest of Mrs. Skinker was very different. Her whole patrimony consisted in her share of the debt due from Irvine and James M. Hite; and that debt had been secured to her by her father in reserving a lien upon land of sufficient value to make it secure, and its payment certain beyond a peradventure. There was no reason why she should give up. *526 her whole interest in her father’s estate thus secured to her, and no consent on the part of the other heirs could possibly affect her interest. The argument now made, that a majority having assented to the arrangement the executor ought to be relieved, was not one which had any weight with as good a lawyer as Mr. Philip Williams; for the record shows that he made more than one attempt to obtain the consent of Skinker and wife, all of which were ineffectual, and it was not until Irvine Hite proposed to leave in his hands the sum of over four thousand dollars “ to indemnify him,” that he consented to the arrangement. He knew well, thai the assent of James M. Hite in his own right, could not bind Mrs. Skinker in any possible contingency. He not only sought himself to obtain their consent but gives prominence in his answer to the fact that Irvine Hite expressed the opinion that Skinker and wife would give their assent to the arrangement proposed, and that he promised to see them and obtain their assent. All this shows that it never entered into his head to conceive that the assent of two of the heirs could in any way' bind Mrs. Skinker.
But it is insisted that the executor is relieved from all liability, and the whole loss must fall upon the appellees, because Skinker and wife heard of the sale and did hot object to it, though they had opportunity to inform the executor-of their dissent, and, because they failed to do this, they must now be placed in the same situation as if they had given their assent. The record shows that Mrs. Skinker was in a distant county, which, part of the time, was in the lines of the federal armies, and all the time difficult of communication with the town of Winchester. It is not t shown that she knew anything of the matter till after *527 the land was sold. Her husband, it is shown, was, 7 77 during the whole war, either in the Confederate army or in a northern prison, or in a hospital suffering wounds and sickness. He passed through Winchester but twice in the year 1863, once just after the battle of Gettysburg, under marching orders not to leave the ranks, and shortly afterwards on the Sabbath, when prostrated by sickness, and was sent immediately to a hospital at Staunton. Neither had the opportunity to express their dissent, if that was at all necessary to protect their interests. But was it necessary? Were their legal rights to be effected by the fact that they expressed no dissent? By no means. It was not a case where their “ silence gave consent.” If they had had the most ample opportunity to speak, their silence was sufficient to protect them. Without their voluntary consent, there was no power on earth that could wrest from Mrs. Skinker the patrimony which her father had so well secured to her, and compel her to receive Confederate money or Confederate bonds in the place of it. It was enough that she should remain silent and withhold her consent. ■ Without her consent, the executor has undertaken to convert her patrimony into a currency that has perished; without her consent, he has undertaken to put her all in Confederate bonds, not worth the paper upon which they were printed ; without her consent, he has deliberately chosen to take upon himself the responsibility of receiving a depreciated currency, and investing in worthless bonds what was a certain and ample security; without her consent, he has deliberately assumed upon himself the l’iskof assenting to a sale and receiving a depreciated currency, which at the time he admits in writing, under his own hand, “it was not proper for him to receive unless with the consent of the heirs;” and he *528 executes a deed as executor, which he had no right under the will to execute (until after the death of the-testator’s widow), conveying the vei’y land upon which Mrs. Skinker’s legacy was secured. And while he has thus deliberately taken upon himself this risk and this responsibility, his representatives here are seeking to-throw the loss occasioned by it upon parties who never-have, by word or act, done anything to deprive them of their unquestioned legal rights. I am constrained, however'reluctantly I may be forced to that conclusion, to say that the executor by his conduct in this transaction has committed a devastavit, for which the law fixes, upon him personal liability. In saying this, I am very far from attributing to him any fraudulent purpose. The whole record, as well as the high personal and professional character, which has secured for him, wherever he was known, a reputation for integrity, second to none, all alike forbid any such imputation. His conduct no doubt was influenced by a desire to accommodate Irvine and James M. Hite, both of whom were interested in selling the land for Confederate money. He no doubt thought that the consent of Mrs. Skinker would be given to the arrangement. He felt .(confident as hé was in the final triumph of the southern cause) that he was secure against all loss in having in his hands upwards of four thousand dollars over and above the amount due to Mrs. Skinker, paid to him, as he says in his answer, to indemnify him in the event Mrs. .Skinker withheld her consent to receive it. But having assumed that responsibility, and deliberately incurred that risk, the court will not now permit his representatives to cast that loss upon parties who were never actors in the transaction which occasioned it; but it must rest where the law fixes it, upon the executor, whose acts *529 amount to a devastavit, by which he incurs a personal liability.
Much has been said in argument about the hardship of holding the executor bound in this case. Such hardships meet us every day. The “ hard cases ” arising out of transactions in Confederate currency are constantly before us and constantly to be deplored. This is but another fragment of the numberless wrecks and widespread ruin which are found in the track of the terrible storm of civil war which has desolated our country and wrecked the hopes and the fortunes of a whole people.
But if a court is to be turned from its line of duty in the stern administration of justice upon the well settled principles of law governing each case, by considering the peculiar hardship of the case, would not that consideration operate with full force in favor of the appellees, Skinker and wife. Is it not as “ hard a case” that the loss should fall upon them ? Would it not be a great hardship to take away from a married woman who never, through herself or her husband, by word or act assented to any of these arrangements entered into by the executor and the other heirs, that patrimony which her father in his will and by his solemn agreement had so carefully secui’ed to her ? Would it be no hardship to Skinker, who, when these transactions were going on, was fighting the battles of his country, or languishing in a Northern prison, or sick and wounded in a hospital, and had nothing to do with them, except to withhold his consent from an arrangement which others were deeply interested to make but which must certainly impair if not certainly destroy his wife’s patrimony. Would it be no hardship to him, after the war was over, after suffering all its privations and dangers and wounds and imprison *530 ments, when he comes to demand the little patrimony of his wife, which he properly refused by any act of his to deprive her of, that the court should thrust upon him a bundle of worthless Confederate bonds, and say to him there is the patrimony of your wife which her father was so careful to secure to her, and which you were so careful never to release, or transfer, or impair by any act of yours, but which without your consent, without her consent, has been converted into worthless trash. If the. case is to be tried by the hardship which is to result from the decision, that consideration, it seems to me, operates with double force in favor of the appellees. But we have nothing to do with the hardship of the case. The hardship cannot be mitigated; the loss cannot be divided. It must fall on the one side or the other. It must be placed where the law fixes it. In my opinion, it must fall in this case upon the executor, who has knowingly and deliberately assumed the risk, and by his own conduct incurred a personal liability. I am of opinion that the decree of the Circuit court should be affirmed.
Moncure, P., and Anderson, J., concurred in the opinion of Christian, J.
Staples and Bouldin, Js., dissented.
The court having affirmed the decree, the appellant asked for a rehearing of the case.
Anderson, J.
I have had great difficulty in bringing my mind to the conclusion, in this case, that the appellees are entitled to hold the executor responsible for that portion of Mrs. Skinker’s legacy from her father, which has been lost by the executor’s receiving payment thereof in Confederate securities, although *531 received by bim without her consent. The executor undoubtedly' acted in good faith. He had no private interest to subserve in what he did. He made investments about the same time in Confederate securities. His most prudent and judicious neighbors did likewise. It is probable that he believed such investments were safe, having confidence in the success of the Confederacy. Hnder such' circumstances I do not think it would be right to hold a fiduciary, an executor or administrator, responsible for the loss, if he acted within the scope of his authority and duty. But he must act strictly within the line of his duty.
Although a personal representative, acting strictly within the line of his duty, and exercising reasonable care and diligence, will not be responsible for the failure or depreciation of the fund in which any part of the estate may be invested, yet if that line of duty be not strictly pursued, and any part of the property be invested by such personal representative in funds or securities not authorized, or be put within the control of persons who ought not to be entrusted with it, and a loss thereby be eventually sustained, such personal representative will be liable to make it good, however unexpected the result, however little likely to arise from the course adopted, and however free such conduct may have been from any improper motive. 2 Lomax’s ex’ors, top p. 483, side p. 293.
In this case, upon mature deliberation, I am reluctantly forced to the conclusion that the executor did not act strictly within the line of his duty and authority. The will was his directory. It clothed him with all the authority he had in the premises. It was the law to him. It was his duty to follow its directions, and to carry out the intention of the testator. When a dying man confides to a surviving friend the execu *532 tion of the testamentary disposition of his estate, in relation to those who are the objects of his bounty and affection, he ought to die with the assurance that his intentions will be carried out. It is a sacred trust, and must be enforced. When the will contains express directions what the executors are to do, an executor, who proves the will, must do all which he, as executor, is directed to do. (Ibid as above, § 2, top p. 475, side 288.) It is true that an executor has an absolute power of disposal over the whole personal effects of the testator, so that they cannot be followed by creditors or legatees, either general or specific, into the hands of the alienee. But in disposing of them I apprehend he must follow the directions of the will, otherwise he is not acting in the line of his duty. 80 he may collect debts due the testator, and it is his duty to do so, but not, as a general rule, to receive payment in a depreciated currency. He may collect them if necessary to pay debts or legacies, but not, when well secured, for the purpose of investment in uncertain securities, or to receive payment in a depreciated currency for the payment of legacies without the consent of the legatees. But in the exercise of these powers, if the will has given directions how they are to be exercised, he is not acting in the line of his duty if he does not follow these directions.
In this case, if the executor had conformed to the provisions of the will and to the contract which the testator had made with his sons, which was evidently made in contemplation of death, and may be regarded as a part of his testamentary disposition, and which at least as executor he was bound to enforce, it is unquestionable that no loss could have been sustained by the legatees, by himself, or anybody else. By the express stipulation of this contract of sale to his sons *533 the testator had bound himself only to convey the title “as soon as the whole of the purchase money and interest thereon shall be paid.” It was a joint contract with his two sons. Each of them was bound for the whole purchase money and the whole land was bound for the whole purchase money. The sons afterwards divided the land between them, and as between themselves, each one was bound to pay his proportion of the purchase money; but as between them and the testator they were jointly bound, and the whole land was bound for the whole of the purchase money. For by the contract the testator had stipulated to retain the title until the whole of the purchase money was paid.
It seems to me that the executor was not acting in the line of duty, when, in order to enable J. I. Hite, one of the purchasers, to pay up and discharge his proportion of the purchase money (as agreed between his brother and himself) in a very depreciated currency, he united with him in a deed of conveyance to the purchaser from him of one-half the land for depreciated Confederate money, and releasing thereby one-half the security for the remainder of the purchase money, without the consent of the legatee who is appellee here. In doing so he also departed from the only authority given to him to convey the title under the contract aforesaid, after the death of the testator’s wife, who was then living. Although he acted from the most generous motives toward J. I. Hite and his sister Caroline, who was importuning him for money, and toward James Madison Hite, he was acting not by the request or with the consent of Eliza Skinker, the legatee who brought this suit for her legacy, and in acting as he did he assumed a personal responsibility. He was aware of it *534 himself. In his letter to James M. Hite, he admits, that as executor it was not proper for him to do it without the consent of the legatees. He accordingly seeks to obtain their consent. He gets the consent of James Madison in his own right and as trustee for his sister Mrs. Baker, and Mrs. Baker’s consent. But he fails to get the consent of Skinker and wife, and, finally, determines to act without their consent, no doubt hoping to get it afterwards; but for his security takes indemnity from Irvine Hite, the party most interested. These facts are convincing to my mind that this intelligent executor and sound lawyer was conscious of assuming a personal responsibility in what he did. And he, I concede most disinterestedly and from the best of motives, resolved to assume it and run the risk, relying, in pa^t at least, for his security upon the indemnity which he had taken. But Mrs. Skinker and her husband declined, as they had a clear right to do, to give their consent or sanction to what had been done. It was the misfortune of the executor to lose the investment which he had, at his own risk, made for them in Confederate bonds, together with his indemnity for the personal risk. And Mrs. Skinker in this suit seeks to recover her legacy, which was. well secured to her by the will of her father upon real estate, which she had never, by any act of hers, sur rendered, and which the executor had no authority under the will to surrender for her. I think she is entitled to it, and I therefore concur in the result of Judge Christian’s opinion.
The decree was as follows:
October 8th, 1873.—This day came again the parties by counsel, and the court having maturely considered the transcript of the record of the decree *535 aforesaid, and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that there is no error in said decree; therefore it is decreed and ordered that the same be affirmed, and that the appellants pay to the appellees thirty dollars damages, and their costs by them about their defense in this behalf expended.
Whereupon, the appellants by counsel moved the court to set aside the foregoing decree and grant them a rehearing thereof; but because the court here is not yet advised of the judgment to be rendered in the premises, time is taken to consider thereof.
And at another day, to wit: the 17th day of November, 1871.—The appellants having submitted a motion at the last term of this court to set aside the decree pronounced in this cause on the 8th day of October 1873, and grant a rehearing thereof, and the court having maturely considered the motion aforesaid, and the arguments of counsel filed therein, doth order that the motion aforesaid be overruled, and that the decree pronounced in this cause, on the 8th day of October 1873, be certified to the Circuit court of Frederick county.
Decree arrirmed.