## Richmond.

### WIMBISH AND WIFE v. RAWLINS' EX'OR AND ALS.

December 15th, 1881.

1. PERSONAL REPRESENTATIVES—*Discretion.*—Testator dying January, 1861, desired his debts paid as soon as convenient, and directed his land in Virginia, and all property on it, except negroes, to be sold on such terms as his executor might deem advisable. He delayed sale until November, 1862.

HELD:

The will vested in him a wide discretion as to time as well as terms of sale, and, acting in good faith, he would not be liable even had loss resulted from the delay.

2. IDEM—*Ex parte settlements.*—*Onus* of overcoming by proof the presumption of correctness which the law attaches to *ex parte* settlements, rests on those who seek to surcharge or falsify them.

3. IDEM—*Credit without scale.*—Executor having received Confederate money from sale of assets, and paid it in discharge of *ante-bellum* debts, should be credited with the full amount so paid without scaling.

4. IDEM—*Ante-bellum debt.*—Exception made for first time in appellate court to receipt by executor of Confederate money in payment of a solvent *ante-bellum* debt, will not be considered.

Appeal from decrees of circuit court of Mecklenburg county in two suits heard together, styled respectively Abram Wimbish and Fannie, his wife, against Carter, administrator *de bonis non* of Edmund Townes, and Tarry, executor of E. A. Rawlins, who had been executor of Townes, and others; and same plaintiffs against Rawlins' executor and *als.* Object of first was to surcharge and falsify the accounts stated *ex parte* of Rawlins as such executor, in his.

lifetime, and by Tarry, his executor, of the administration of the assets of Edmund Townes' estate. Object of second was to surcharge and falsify the accounts stated *ex parte* of Rawlins as guardian of the female plaintiff and to set aside a settlement between the guardian and the ward after her arrival at maturity. Under decrees in these suits the commissioner made reports restating those accounts, to which the plaintiffs filed numerous exceptions. These the court overruled, and confirmed the reports by its decree of April, 1878, and the plaintiffs filed their bill of review. But by its decree of July, 1878, the court refused to review that decree and the plaintiffs obtained a *supersedeas* from one of the judges of this court.

The facts are sufficiently stated by the court in its opinion.

*Flournoy & Barksdale, Wood & Wood,* for appellants.

1. Selling the land not as directed by the will and when not needed for payment of debts, Executor Rawlins should be charged with its value in good money. See Code 1860, ch. 129, § 2; *Gregory* v. *Winston's Ex'or,* 23 Gratt. 102.

2. Executor Rawlins should have been charged with par value of bank stock lost by his negligence, and with $1,385.50, the amount of Snead's solvent *ante-bellum* bond, which executor collected in September, 1863, in Confederate money. See *Williams' Adm'r* v. *Skenkes,* 25 Gratt. 507.

3. Executor R. should not have been credited with the full, but with the scaled value of the Confederate money paid by him in discharge of *ante-bellum* debts. See *Crickard* v. *Crickard,* 25 Gratt. 425; *Skipwith* v. *Cabell's Ex'or,* 19 Gratt. 758; *Crawford* v. *Sheever,* 29 Gratt. 69; *Campbell's Exor's* v. *Campbell,* 22 Gratt. 649; *Moss* v. *Moorman's Adm'r,* 24 Gratt. 97; *Moses* v. *Hart,* 25 Gratt. 795; 2 Perry on Trusts, § 847.

*W. E. Homes,* for appellees.

1. Testator empowered executor to sell his land, and did not limit him as to time or terms of sale. The delay did not hurt, but helped the estate.

2. Executor held the bank stock till the close of the war, as many a prudent man held his own, and is not liable for the unforeseen result. As to the collection of the solvent *ante-bellum* Snead debt in·Confederate money, no complaint thereof was made below, and cannot be here. See *Corbin* v. *Mills' Ex'or,* 19 Gratt. 438; *Simmons* v. *Simmons,* 25 Gratt. 507.

3. Executor used Confederate money belonging to the estate to pay *ante-bellum* debts, thus virtually making it good money, and was entitled to credit for the full amount so paid unscaled. See *Moss* v. *Moorman,* 24 Gratt. 97; *Staples* v. *Staples,* 24 Gratt. 225.

ANDERSON, J., delivered the opinion of the court.

Edmund Townes died in January, 1861. By his will, after making an inconsiderable legacy to his son, William H. Townes, he gives and bequeaths to his other six children (naming them) the balance of his estate, both real and personal—his wife, if she should survive him, taking what the law allows her. His will then proceeds: "I desire that all my just debts may be paid as soon as it may be convenient. The land I own in Mecklenburg county, Va. (which is described), I wish sold, and all property upon it, except the negroes, upon such terms as my executors may deem most advisable." He appoints Edward A. Rawlins and his son Joseph Townes his executors. He owned the half of a tract of land in North Carolina, on which he resided, and his wife owned the other half. He recommends

that the whole tract be sold together at the death of his wife, for a division among his six younger children, but if she should elect otherwise, then he directs that his own half be sold, and the proceeds distributed among his six younger children, as above.

Edward A. Rawlins qualified in Mecklenburg county, Virginia, as his executor, in June, 1861, when the will was probated, and undertook the execution of the will in Virginia. About the same time Joseph Townes qualified as executor in Granville county, North Carolina, where the testator resided and had a large estate. It does not appear that Rawlins had anything to do with the management of the estate in North Carolina, or Joseph Townes with that in Virginia.

On the 24th of December, 1861, the executor (Rawlins) caused an inventory and appraisement to be made of the estate of his testator, real and personal, in Mecklenburg county, Virginia, which was returned to the county court of said county and recorded. The appraisers are characterized by the commissioner as wealthy and intelligent gentlemen of the neighborhood. The land was valued at $10,000, the negroes at $7,950, and the whole property, real and personal, at $21,410.15. From which deduct the land and negroes, and it leaves $3,460.15 as the value of all other property.

The land and personal property directed by the will to be sold was sold in November, 1862. The land sold for $12,000—one-third cash, and the balance in two equal annual payments. He collected the cash payment and one of the deferred payments in Confederate money, which he applied in payment of debts and expenses of administration as far as it was needed for that purpose, and the balance he distributed amongst the legatees. He settled his accounts regularly before a commissioner, which were returned to court, and no exceptions being made to them,

were regularly confirmed by the court and ordered to be recorded.

This suit was brought by Wimbish and wife, the appellants, the wife being a daughter and legatee of the said Edmund Townes, deceased, after the death of E. A. Rawlins, the executor, in January, 1875, against George P. Tarry, executor of E. A. Rawlins, deceased, to surcharge and falsify said settlements, and for the distribution of so much of the estate as they alleged was in the hands of Rawlins at his death.

The same plaintiffs also filed their bill in chancery against the said Tarry, executor of Rawlins, who was guardian of the female plaintiff, to rescind a settlement which had been made by the said guardian with his said ward, after she had attained full age, and to cancel and annul a bond which she had executed to him pursuant to said settlement, and to recover what might be due the said female plaintiff upon a proper settlement of the guardianship accounts.

Accounts were ordered and taken in both cases, and the causes coming on in vacation, by a consent order entered of record together on the 1st day of April, 1878, on the papers formerly read, on the report of Commissioner W. T. Atkins, filed 14th of November, 1876, and exceptions thereto by complainants, the court was of opinion that there was no error in the said report of Commissioner Atkins, overruled all the exceptions thereto, and confirmed the same.

In July following the plaintiffs filed a petition to rehear said vacation decree confirming Commissioner Atkins' report, and to reopen the case. And on the 6th day of July, 1878, the court entered a final decree refusing to rehear the causes, and to review its vacation decree aforesaid, and made distribution of the fund in the hands of the executor amongst the legatees of Edmund Townes, and decreed against the appellants in favor of E. A. Rawlins, deceased,

the sum of $533.23, with interest on $520.63, part thereof, from the 22d of April, 1869, subject to a credit of $36.44, as of the 15th of April, 1872, their proportion of the balance due from the estate of E. A. Rawlins, deceased. The report of Commissioner Atkins, filed November 14, 1876, reaffirms the report of same commissioner filed· November 6, 1875, which shows a balance due the estate of Rawlins' executor on the 15th of April, 1872, of $225.32, which is confirmed by said final decree, and is the amount of which distribution is made among the legatees of Edmund Townes, deceased.

The settlements assailed by the plaintiffs' bills are made the basis of the accounts taken by the special commissioner as aforesaid, and the court below was of the opinion that the plaintiffs had wholly failed to successfully surcharge and falsify the same.

Those settlements were properly taken to be *prima facie* correct, and the onus was on the plaintiffs to repel that presumption, by showing that they were not correct. It was not sufficient to allege surcharges and falsifications, but it was necessary to prove their allegations.

We deem it unnecessary in this opinion to review the exceptions in detail taken to those settlements, or to the reports of the special commissioner, or the proofs or reasons urged either *pro* or *con*. We deem it only necessary to say that we think it appears from the record that the executor acted in good faith in all his transactions, and with a view to the advantage of the estate; that he managed the estate as well, in all probability, as it could have been done under the circumstances, and that the plaintiffs have failed to show the errors, either of surcharge or falsification, which they allege in their bills, or assigned or suggested before the commissioner on taking the account, and that if it now appeared that anything which the executor did, or omitted to do, had not resulted as well for the estate

as he might have expected, he having evidently acted within the limits of his discretionary power for the best, and as he might reasonably have believed at the time would be for the best, it would not be reasonable or just, after so great a lapse of time, and the acquiescence of all parties during his life in his management of the· estate, now after his death to hold his estate responsible for re-·sults, which have not been as favorable as they might have been if he had pursued a different line in the management of the estate.

But really it does not appear that the estate would have been benefited if he had conducted its management differently. The will directed that sale should be made of the land in Mecklenburg county, Virginia, and of all the property on it, except the negroes. This seems to have been the provision for the payment of the testator's debts, which he had expressed the wish in the sentence next preceding should be paid as soon as they could conveniently be paid—giving the executors a wide discretion. And this is the only property which he directs to be sold, except his land in North Carolina, and that is not to be sold until after his wife's death, and then not for paying debts, but for division amongst his six younger children. It seems that he had a large estate in North Carolina, where he lived and died, and it is remarkable that he gave no direction for the sale ·of any part of it, whilst he directs the whole of his property in Virginia, real and personal, to be sold, and that immediately following the clause which directs his debts to be paid; and it is the only provision of the will for raising a fund out of which his debts could be paid, which was very considerable; and as we have seen that he gave his· executors a wide discretion as to the time when they should pay his debts—as soon as they could conveniently; and the sale being authorized and ordered manifestly for the purpose, at least in part, of enabling them to pay his

debts, it should be construed as giving to his executors, as to the time of selling the same, discretion, as he had given them as to the time of making payment of his debts. It seems that the executor Rawlins did not deem it expedient to make sale before November, 1862. He did not qualify until the June court of 1861. He could not have sold before he qualified as executor. The law imposed no obligation on him to accept the trust, or to qualify as executor at all. It was for him to determine whether he would assume the burden of executing the will, and when; and until he had assumed it by qualifying as executor, no responsibility rested on him. After he qualified as executor in June, 1861, it would have been manifestly injudicious to have made sale until the wheat crop was garnered and prepared for market, and until the spring crops which were then planted were cultivated and gathered. He did not make the sale until November, 1862. He is not here to give his reasons for the postponement. The war had then commenced; the country was in an unsettled state, and the commissioner mentions that there was great depression in the sales of property at that time. It is not alleged that he had any personal interest in postponing the sale. It does not appear that any of the debts were pressing, and it is fair to presume that he postponed it with a view to benefit the estate. And it appears that the estate was benefited by it.

The land, as we have seen, was valued in December, 1861, at $10,000 and sold at the sale for $12,000, one third in cash and the residue in one and two years. The personal property was appraised at $3,460 and sold for $9,029 at the sale in November, 1862, on six months' credit. The cash and first deferred payments for the land were received in Confederate money. For the last payment the executor obtained a judgment since the war, and the purchaser having gone into bankruptcy, the legatees obtained a

decree for the sale of the land to satisfy it, which did not sell for enough to pay the whole amount, and they are proceeding against other property of the purchaser to make the balance. So it seems they got $8,000 for the land in Confederate money, which was used as far as needed by the executor in paying debts of the testator at their face value, and they got the land back, or might have gotten it if they had chosen, for less than the last instalment. If the sale had been made in the fall of 1861, the land and property on it could not, in all probability, have sold for more than the valuation put upon it, and would have been paid for wholly in Confederate money, which could have been used to no better advantage than the proceeds of the sale which was made in 1862 were used, so far as they were received in Confederate money, and so far as the last instalment for the land has been or will be received in good money, it is a clear gain.

We think there is no ground for the appellant's assumption and insistence that the executor should be credited by only the scaled value of the Confederate money of the estate, which he used greatly to the advantage of the estate in paying its debts and the expenses of administration at its face value.

The appellants object to the collection by the executor Rawlins of the Snead debt of $1,385 in 1863, and charge that it was a *devastavit*. No exception was taken to this item in the *ex parte* account settled by the commissioner and returned to court and confirmed, either in the plaintiff's bill or before the special commissioner who stated and reported the account in this suit, and is made for the first time in this court. If the objection had been made in the court below, the defendant might have taken testimony to show that it was a Confederate debt, or if an *ante-bellum* debt, that it was insecure, and that the debtor was in fail-

ing circumstances, and that if it had not been collected then would have been lost. It is too late to make the objection for the first time in the appellate court. *Corbin* v. *Mills,* 19 Gratt. 438 ; 25 Gratt. 507 ; *Simmons* v. *Simmons' Adm'r,* 33 Gratt.

.There are a number of other exceptions to the commissioner's report, and assignments of error, which the court has carefully considered; and without remarking on them severally, it is of opinion that they are not sustained, and that there is no error in the decree of the circuit court for which it should be reversed, and the same is affirmed.

DECREE AFFIRMED.