Wytheville.

BELL & WIFE v. MOON, COM., &c.

August 14, 1885.

1. EQUITY JURISDICTION AND RELIEF—*Laches and Lapse of Time.*—Where statute of limitations has no direct application, a defence may, in a court of equity, be founded on mere lapse of time and staleness of claim. Sometimes the court acts by analogy to the law; sometimes by its own inherent doctrine of discouraging antiquated demands where there has been gross *laches* in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights. But every case depends on its own particulars. *Hill* v. *Umberger,* 77 Va. 653; *Updike* v. *Lane,* 78 Va. 132; *Coles* v. *Ballard,* Id. 139.

2. PRACTICE IN CHANCERY—*Bill to Surcharge—Effect of Answer.*—Where bill makes certain items of *ex parte* settlement subjects of special surcharge, and calls on defendant to account therefor, defendant's answer, though containing affirmative allegations giving such account in detail, is responsive to the bill and evidence for defendant. *Corbin* v. *Mills,* 19 Gratt. 466; *Morrison* v. *Grubb,* 23 Gratt. 342.

3. ASSIGNMENT—*Possession—Presumption.*—Bonds and notes may be assigned by mere transfer, without indorsement, in which case, however, only the equitable title passes, and possession thereof creates a *prima facie* case of ownership.

4. PARENT AND CHILD—*Implied Promise.*—Where child marries and leaves parental roof, then returns to reside there with adequate means of support, and is boarded by father, the law presumes in such case, as in others, a promise to pay from the acceptance of the benefit.

Appeal from decree of circuit court of Lynchburg, entered 18th day of May, 1882, in the cause of J. P. Bell and Emma K., his wife, against Littleberry Moon, as committee, and afterwards

as administrator of E. K. Gilbert, deceased.    Argued at Richmond, but decided at Wytheville.    Gilbert had married Moon's daughter in 1850.    Before his marriage  he sold goods at Merry Oaks, in  Pittsylvania  county ;  was  unfortunate  in  business. Sold out to Edmund Clark ; took  his  three bonds for $1,555.43 ; got Moon to cash them, transferring them without endorsement ; borrowed $667.10 from  Moon, and other sums from  others, and with  such  capital, not exceeding $4,000  in all, he  again began to sell goods at Leesville, Campbell county.

In  November, 1850, Gilbert  evinced  insanity, and  was  confined  in  the  asylum  at  Staunton.    In  December, 1850, Moon qualified as his committee, and settled his affairs.

Mrs. Gilbert and  her  child went to her father's house to live, and lived  there  not  only  until  Mr.  Gilbert's  death, in  1855, when Moon qualified as his administrator, but until 1857, when the  mother  died, and  John  Edwards qualified  as  guardian of her child, who is the female appellant.

As committee  and  as  administrator  of  E.  K.  Gilbert, Moon made  a  number  of  *ex parte* settlements, which  were  duly confirmed and recorded.    In 1881 Bell and wife brought their bill to  surcharge and  falsify those settlements.   The  items  in controversy were  three : 1, the  three Clark bonds; 2, the  loan of $667.10; 3, board charged to Mrs. Gilbert at the rate of sixty, and  to her child  at the rate of twenty-five dollars  per annum. As to  these items, full  detail was  entered  into  and  searching inquiry made  by the  bill.    Moon answered also in  detail, according  to  the  facts  as  heretofore  stated.    Depositions were taken.    And the cause coming on to be  heard, the circuit court dismissed  the  bill  at  the  plaintiff's  costs.    From  this  decree Bell and wife obtained an appeal to this court.    Opinion states the case more fully.

*Carrington & Fitzhugh,* for the appellants.

*Kirkpatrick & Blackford,* for the appellee.

RICHARDSON, J., delivered the opinion of the court:

The transactions most called in question by the plaintiffs below, the appellants here, occurred in 1850, and had remained unquestioned, and, so far as disclosed by the record, without any suspicion on the part of Moon, for more than thirty years, that they could or would ever be called in question. The female appellant is the daughter of said E. K. Gilbert, and the granddaughter of said Moon. From circumstances disclosed by the record, the fact appears that certain influences, not in themselves commendable, had been secretly at work fomenting this litigation for some years prior to its commencement; but all this was among the legal guardian and certain kindred of the female appellant, as to all which, so far as shown by the record, the said Moon was entirely ignorant. The matters thus discussed or hinted at by these people among themselves, and of which Moon had no knowledge, were allowed to sleep unasserted until a generation nearly had passed away, and until, in the nature of things, all recollection of many of the transactions had either been obliterated, or so faded from the memory of the principal actors as to become almost, if not entirely untrustworthy. Therefore, at the very threshold of inquiry we are met with the doctrine in reference to stale demands. In cases where no statute of limitation has direct application, the well established principle is that a defence peculiar to courts of equity, is that founded upon the mere lapse of time and the staleness of the claim. In such cases, it is said: "courts of equity sometimes act by analogy to the law and sometimes upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross *laches* in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights." That such is the firmly settled doctrine of this court no one will deny.

In *Robertson* v. *Read*, 17 Gratt. 556, this court reversed

the circuit court of Amherst, in respect to a matter of account, in which an item of a large amount had been allowed by the circuit court, which allowance was made to correct a manifest error, the court declaring that the claim to correct this error "ought to be disallowed and rejected in consequence of its staleness, and of the probable impossibility, from lapse of time and death of parties, of ascertaining the facts of the case and doing justice." The claim in that case, like this, was thirty years old. Again, in the case of *Smith* v. *Thompson's Adm'r*, 7 Gratt. 112, this court held, that a party who comes into a court of equity to enforce an equitable claim, must do so within a reasonable time, and he must not delay, until by his negligence there can no longer be a safe determination of the controversy, and his adversary is exposed to the danger of injustice from the loss of information and evidence. The same doctrine was applied by this court in *Hill et als.* v. *Umberger's Adm'r et als.*, 77 Va. (2 Hansbrough) 653. "The application of this equitable doctrine is for the sound discretion of the equitable forum, and does not require conviction against the original justice of the claim, or of any other specific ground of defence, but its belief that under the circumstances of the case it is too late to ascertain the merits of the controversy." Baldwin, J., in *Smith* v. *Thompson's Adm'r*, *supra*.

The case under consideration is one in which a grandchild and her husband sue a grandfather, nearly eighty years of age, when every source of information likely to throw light on the transactions in question, is so obscured by time and circumstances as to be unreliable, to say the least.

The bill filed is a remarkable one, exhibiting much asperity of feeling, so much in fact that its authors seek to break its force by repeated half apologetic explanations. The bill undertakes to *surcharge and falsify every item of credit to the fiduciary in his nine settled accounts.* Not even one item is exempted. And, as if relying on the very staleness of their claim as entitling it to meritorious consideration, the complainants in their bill

say: "These plaintiffs call upon him (Moon) now, at this late day, for a full and final settlement of his accounts,   *    *    * which has never been made." The bill calls for the most minute and searching scrutiny into each and every item in the settled accounts, and the production of *every voucher and every claim* making up said settlements, and running between the years 1851 and 1863, and to state directly upon what vouchers or other evidence *each item* of charge in said fiduciary's accounts was established and allowed. The bill is a sweeping one. It ignores the settlements regularly made by this fiduciary; ignores the fact that all the special and particular vouchers called for were necessarily filed with the commissioner making the settlements, and might or might not be in the reach of Moon, according to circumstances, after the lapse of so great a period; ignores all claim to protection arising from the long-settled accounts, and calls on Moon, as if no settlement of his accounts had ever been made, to render a new and complete account of all his actings and doings.

Of the broad and sweeping list of items of surcharge and falsification, those at last really in question are only three: They are: (1), three bonds, known as the Clark bonds; (2), an item of $667.10, charged by Moon as a loan to his son-in-law, Gilbert; and (3), the items of board charged by Moon against his daughter, Mrs. Gilbert, and her child, now the female appellant here.

First, it is necessary to see what were the Clark bonds and their relation to this case. In May, 1850, E. K. Gilbert married Maria Moon, the daughter of the appellee, Littleberry Moon. Gilbert had been unfortunate in business in Richmond, removed to the country, and for some two years had been engaged in a small mercantile business at Merry Oaks, in Pittsylvania county. In April, 1850, he sold out his business at Merry Oaks to Edmund Clark for $1,555.43, taking from Clark three bonds, one for $514.77, one for $520.33, and the other for $520.33, at six, twelve, and eighteen months respectively, and all dated May the

1st, 1850. These are the Clark bonds in controversy. After his marriage Gilbert went to Leesville, Campbell county, to live (where his father-in-law, the appellee, resided), and in the summer of 1850 he determined to go into the mercantile business there, and accordingly he purchased a lot and storehouse of Wm. E. Andrews for $525, and laid in a stock of goods, and about that time (August 6th, 1850) he borrowed of James Gilbert $550, for which he gave his bond. This bond and the $525 due Andrews for the store-house and lot, were paid off by the appellee, Moon, in 1851 and 1852, and Andrews made the deed in November, 1851. As near as can be ascertained from the record Gilbert, when he went to Leesville, had the following estate, to wit: The Clark bonds, $1,555.43 ; two slaves, worth some $1,700 ; these with his personal effects and debts due him from his business at Merry Oaks, did not exceed—say $4,500, the amount of his estate when he was married.

In August, 1850, Gilbert having begun business at Leesville, borrowed the $550 of his relation, James Gilbert. In addition, Moon claims that previous to the borrowing of the $550 from James Gilbert, he (Moon) had at the solicitation of his son-in-law, E. K. Gilbert, cashed and taken the Clark bonds, and that these sums being insufficient, Moon, in September of the same year, loaned his said son-in-law the sum of $667.10, the amount of a certificate of deposit held by Moon on the Lynchburg Savings Bank. It appears that Moon sent this certificate of deposit to Johnson, Younger & Smith, merchants in Lynchburg, who drew the money, and by Moon's direction placed the amount to the credit of Gilbert on the 17th day of September, 1850, and on the 25th day of the same month, Gilbert drew the same for his own use.

Thus it appears that all, or about all, the funds Gilbert had to put into his business at Leesville were—if Moon's theory be the correct one—(1), the proceeds of the Clark bonds, cashed by Moon, say $1,555 ; (2), borrowed of James Gilbert, August, 1850, $550; (3), borrowed of Graves, $1,000; (4), borrowed of Moon September, 1850, $667, aggregating $3,772.

In November, 1850, Gilbert's conduct began to indicate aliena-
tion of mind, causing much uneasiness to his friends. Soon
thereafter Gilbert's insanity became a confirmed fact, and he
was taken to the asylum at Staunton. His father-in-law, Moon,
qualified as his committee in December, 1850, and at once pro-
ceeded to put Gilbert's affairs in order. Gilbert had purchased
goods on credit, some of which, after Gilbert became insane,
were, by arrangements effected by Moon, returned in bulk to the
merchants from whom they had been purchased, and the rest of
the goods on hand were sold out to different parties. In this
way, Moon, in the first year that he acted as committee, realized
something over $3,000; and other sums were collected by him
later, but they need not be here referred to in detail.

Thus, we have the circumstances which gave rise to the two
first items in controversy, to-wit: the Clark bonds and the
$667.10 loaned, as claimed, by Moon to Gilbert. The only re-
maining item is that charged by Moon for the board of Mrs.
Gilbert, while living with her father after her husband became
insane. This will be noticed in its order in the assignment of
errors.

These being all the items really in controversy, let us return
to the Clark bonds, the first in order.

In their bill, the plaintiffs charge that these bonds passed into
the hands of Moon as committee of Gilbert, and have never been
accounted for by him; and that, therefore, to the extent of these
bonds the settlements of Moon should be surcharged less the
amounts paid thereon, as claimed, by Clark to Gilbert. It is
worthy of remark, and somewhat significant, that in their bill,
the plaintiffs make a statement in detail about these bonds, the
credits endorsed thereon, and to whom paid; but they fail to
exhibit with their bill the bonds themselves, with the endorse-
ments thereon ; so that, in this respect, it seems that Moon, be-
fore answering the bill, had no opportunity of inspecting them.

In his answer, in respect to these bonds, Moon says: that the
notes executed by Edmund Clark to E. K. Gilbert, dated May
1st, 1850, never came to his hands, and were not collected by

him, as committee or administrator of E. K. Gilbert. "Those notes or bonds," he says, "were executed for the purchase money of Gilbert's stock of goods in Pittsylvania, which he sold out to said Clark, about two weeks before he married respondent's daughter, which occurred on the 14th day of May, 1850, indicating, respondent believes, that said Gilbert intended leaving Pittsylvania before his marriage. Having determined to commence a mercantile business in Leesville, and being without means necessary for the purpose, he induced respondent to cash said notes, which were thereupon delivered to respondent as his property. Why no formal assignment to respondent was then made of said notes, respondent is now unable to explain, except from the fact that the relations of said Gilbert and respondent were then as they naturally should have been, most friendly and intimate." It was, he further says, with the money paid for said notes, and with $667.10, loaned said Gilbert, by respondent, on the 17th of September, 1850, that said Gilbert purchased, and, in a large measure, paid for his new stock of goods. And he further says: "The said Clark notes were the property of said respondent, and in his possession some considerable time before said Gilbert became a lunatic; and that said Clark not many years thereafter died, when John Edwards became his administrator." The bill, be it remembered, expressly calls on Moon as committee and administrator, "to answer each and every allegation of surcharge and error, both in his accounts as committee and administrator, and any other allegations made, *on oath, as minutely and specially* as if more specially enumerated in this prayer of their bill, and as if he were interrogated as to each item of surcharge and falsification," &c. Now, in view of the severely searching character of the bill, it must be admitted that the above answer of Moon, in respect to these Clark bonds, is full, frank and clear, and directly responsive to the charge in the bill; certainly as much so, considering the great lapse of time, the death of parties to the transactions, and other circumstances, as human agencies could well afford.

In this connection, the question is presented, is Moon's answer

under the circumstances, in respect to this item of surcharge (the Clark bonds) evidence for him? We think it clearly is. In the first place, it appears that, prior to 1880 there was, as shown by Moon's settlements, the sum of $111.67 due from him to his grandchild, Mrs. Bell, the female appellant; that Mr. Bell, her husband and the male appellant here, in October and November, 1880, before suit was brought, wrote several letters to Mr. Moon, by which it appears that said Bell, after examining all the recorded settlements, demanded and collected the said balance of $111.67, shown by said settlements to be due to his wife, and made no objection to any item in said settlements, except the failure to account for certain bonds listed in the inventory, and for the Clark bonds not listed. Afterwards, discovering that as to the former objection, he was mistaken, it was withdrawn by him, thus leaving only the Clark bonds in controversy; so that this suit, as to everything except the Clark bonds, was afterwards brought to reopen and investigate matters in effect agreed and settled between the parties.

In answer to such a bill as the plaintiffs, calling for an account of each item in the settled accounts, and making the Clark bonds a special item of surcharge, we can but conclude that the answer of Moon in respect thereof is evidence for him.

In *Corbin* v. *Mills*, 19 Gratt. 438–466, the court, answering the contention of counsel for the plaintiff, that the *affirmative allegations of the answer* could not *be received as true* unless sustained by proof, says: "The bill, however, calls upon the executors to render an account of all their doings and actings as executors, and the allegations of their answer, though affirmative, must be taken as true unless disproved, so far as they relate directly to the account which they were required to give." And the court, in support of this ruling, cites *Fant* v. *Miller & Mahew,* 17 Gratt. 187, in which Moncure, J., after citing the rule as laid down by Story, declares: "The rule not only applies where a material allegation of the bill is denied by the answer, but also where a material disclosure is called for by the bill and

made by the answer. The answer is as much responsive to the bill in the latter as in the former case, and comes within the very terms of the rule. Nor is the rule in regard to the effect of such a disclosure confined to a bill of discovery, technically so-called, or a pure bill of discovery, as it is sometimes called." And he quotes, with approval, the opinion of the court below, which held that though this was not a pure bill of discovery, the answer of the defendant "*should be taken as true in regard to the matter discovered by it.*"

Again: The case of *Morrison's Ex'or* v. *Grubb*, 23 Gratt. 342, is a case strikingly like the case at bar, so much so in fact that its rulings, it would seem, must necessarily determine this case. There is but one distinction between the cases, and that favorable to this case: Moon, by virtue of his relations to Gilbert's estate, was charged by law with the duty of accounting for it. In *Morrison* v. *Grubb*, the defendant stood in no such relations and was under no like obligations. It is well said by counsel for the appellee that the importance of this consideration in the law of evidence is forcibly illustrated by the case of *Mertens* v. *Nottebohm*, 4 Gratt. 163.

In *Morrison* v. *Grubb, supra,* the bill charged that there was a large amount of bonds and notes which belonged to Morrison in his life-time, which were in his possession shortly before his death, and which, after his death, were in the possession of the defendant Grubb, and called on Grubb to discover, produce and surrender the same to the plaintiff-executors, who then owned them. Grubb, in his answer, uses language almost identical, *mutatis mutandis,* with that of Moon's answer quoted above. He said "that he had not in his possession, or under his control, at the death of Morrison, any bonds which were, at the death of Morrison, his property, or to which the complainants, as his executors, or in any other character, have any right, title or interest." He then proceeded to set forth his claim and title to said bonds, alleging that Morrison, on his death-bed, had handed him the pocket-book containing the bonds and notes,

saying, as he did so, "Here, Joe, take this; take it home with you and keep it."

The bonds and notes in that case, like the Clark bonds in this, had no assignment or transfer endorsed on any of them. Other authorities, English and American, might be referred to, fully sustaining the above proposition; but those already noticed, and especially that of *Morrison's Ex'or* v. *Grubb*, are ample to illustrate the rule, and are conclusive of the question under consideration. And there being no evidence disclosed by the record, sufficient to overturn the answer in this respect, it is to that extent conclusive of the case.

But, in still another view, there being no proof to the contrary, the possession of the bonds by Moon, makes a *prima facie* case of ownership by him. A bond assigned in the regular way by endorsement, or transferred without endorsement passes to the transferee, the equitable title. The assignment of bonds or notes is usually effected by an endorsement on the back thereof, declaring the assignment, with the name of the assignor subscribed. The mere endorsement of the name, however, will suffice, as the holder may afterwards write the assignment above it. It not unfrequently happens, however, that *transfers* of bonds are made without assignment. In such cases, though the transfer passes the right to the bond, in case of a suit thereon, the suit must be brought in the name of the obligee, or last assignee of the bond; and in case the person in whose name the suit is brought should interfere to the prejudice of the holder, by dismissing the suit or by receiving the money, a court of equity would not only prevent it by injunction, but even a court of law will inquire who is the real owner, and forbid the obligee, or other person who has passed away his right, from interfering with the transferee. With such legal guards thrown around a transferee, and in view of the fact that there is not a circumstance disclosed by the record calculated justly to cast suspicion upon any act of the appellee; and in view of the further fact that all the circumstances concur to the end,

that Moon, at the solicitation of his son-in-law, Gilbert, bought the Clark bonds, and honestly paid for them in a generous disposition to aid the husband of his own daughter, can there be any sufficient reason for stripping him of his legally acquired rights, because he afterwards happened to bear the relation of committee or administrator to his unfortunate son-in-law? Surely there can be none.

In the argument of counsel for the appellee, it is said with commendable spirit and force, that "the only evidence introduced by the plaintiffs below to controvert the statement made in Moon's answer, is the testimony of John Edwards, who comes into this record in very questionable shape. He had learned in 1852 that Moon had collected the Clark bonds, claiming to own them by purchase from Gilbert. A few years after that he became guardian of the female appellant, and as such should have instituted this suit, if he had reason to believe Moon had cheated his child and grandchild. But he allowed the matter to sleep until the changes of thirty years had buried the transaction from the recollection of all men, and buried nearly every body who could have been cognizant of the facts, and then, when he had to make a settlement of his own transactions as guardian, as to which he was a defaulter, he stirs up this stale controversy, and is made the sole witness to prove the plaintiff's claim."

The evidence of Edwards is that in September or October, 1850, Gilbert told him he had $4,000 or $4,500 then in his possession. This evidence was excepted to as illegal, but supposing, for the sake of the argument, it is admissible and true, what does it prove? In effect, nothing. It certainly does not prove that the amount of the Clark bonds, received by Gilbert from Moon, did not constitute a part of the sum Gilbert told Edwards he had.

On the other hand there is important evidence strongly corroborating Moon's statement in regard to the Clark bonds. Two witnesses, John T. Smith and Mansel T. Smith, both testify that they were well acquainted with the handwriting of E. K.

Gilbert and of Littleberry Moon; that the credits. endorsed on the Clark bond, dated in May and October, 1850, are, according to their best judgment and belief, in the handwriting of Moon, and that they certainly are not in the handwriting of E. K. Gilbert. Why was Moon, at that early day, long prior to Gilbert's insanity, receiving this money and endorsing the credit on the bond in May, 1850 ? For no other reason, than, as Moon himself states, he was the owner of the bonds by honest purchase.

The second assignment of error is that Moon was allowed a credit for the $667.10, as cash loaned by him to his son-in-law on the 17th of September, 1850.

The plaintiff's bill charges that "this cash was never loaned; that there was no evidence of it, and that the credit for that sum was allowed by the commissioner on the simple statement of the committee, Moon, unsupported by any other evidence."

In his answer, Moon says: "Gilbert desiring to purchase for cash, as far as practicable, and *to pay other debts that he owed*, sometime after the first of May, 1850, requested respondent to cash the three said notes of Edward Clark, which he did by their purchase, and afterwards, in September, 1850, *borrowed of respondent* the additional sum of $667.10." This answer is a direct and unequivocal response to the charge made in the bill in regard to this item; and for reasons already given, is conclusive without reference to other circumstances, except to say that the answer in another place fully explains the transaction, so that if untrue it could easily have been shown.

As to the third and last assignment of error, the charges made by Moon for board of Gilbert's wife and child, only a brief statement is necessary.

After her husband became insane, Mrs. Gilbert went to live with her father, the appellee, Moon. The objections to this item seem to be (1), that any charge at all was made, and (2), that it was made in gross, without stating a distributee account, crediting Mrs. Gilbert with one-third of the estate, and her daughter, the female appellant, with two-thirds.

Why should board not be charged? Gilbert remained at the asylum, and did not die until 1855. His estate, after payment of his debts, was properly chargeable with the support of his family *in gross.* Until his death no separation of interests could take place. The estate was his as long as he was alive, and there could be no distributees until his death. Nor was Mr. Moon under any legal obligation to support this family, nor any moral obligation either, while Gilbert had estate ample for the purpose. The charges made by Moon were scarcely more than nominal—$60 a year for Mrs. Gilbert and $25 to $30 for her child—and a part of the time $2 per month for her horse.

In the distress of her condition, she must either keep house or board. She chose the latter, and with her father. It is in proof that the arrangement was far the most advantageous and economical she could have made. When children leave a father, marry, and set up in life for themselves, the presumption that he *gives* them their support, ceases. When they come back to the parental roof to live, with adequate means for their support, unless he chooses to give them board, they are under the same obligation to pay their way as any body else, and, under such circumstances, the law presumes a promise from a benefit accepted. True, after Gilbert's death, in 1855, Moon became his administrator, and the same arrangement continued. It is also true that one year after the qualification of the administrator, to-wit: in 1856, upon well settled principles (the debts having been paid) the personal estate should have been divided—one-third to the widow, two-thirds to the child. This was not done, and the existing arrangement went on until 1857—*a year longer*—when Mrs. Gilbert died, and the whole passed to the child.

Commissioner Bocock, an able and experienced master, in taking the account in this suit passed upon this question. To his statement of the administration account for the first year, 1856, he makes this note: "The administrator charges Mrs. Gilbert and her child board, and takes the amount out of E. K.

Gilbert's estate. This is a technical error; but if stricken out, and the profits, hires, &c., collected each year were divided between Mrs. Gilbert and her child, there would be enough to pay these charges against each of these parties."

This is conclusive. If the form of the account were changed, the result would still be the same. As before stated, these three items constitute really the subject matter of controversy. In the various other exceptions there is nothing requiring notice. In any and every view taken, or that may be taken, we are of opinion there is no error in the decree appealed from, and the same must be affirmed with costs to the appellee.

DECREE AFFIRMED.