Syllabus.

## Richmond.

## RADFORD v. FOWLKES.

### February 21st, 1889.

1. —CHANCERY PRACTICE—*Fiduciaries—Masters—Settlements—Ex parte—Inter partis—Effect.*—The *ex parte* settlement by a master commissioner of the accounts of a fiduciary, shall be taken to be correct, except so far as the same may in a suit in proper time be surcharged and falsified (Code 1873, ch. 128, § 29); and the *onus* is on plaintiff to show that it is not correct. And when such settlement is made in a suit *inter partis*, and is duly returned and confirmed, it cannot be disturbed except for errors apparent on its face or for after-discovered facts.

2. IDEM—*Bill to surcharge and falsify—Fiduciary's answer.*—Bill to surcharge and falsify such settlement must particularize errors; if answer of fiduciary discloses nothing improper, and there be no proof of the specifications, the bill must be dismissed.

3. PERSONAL REPRESENTATIVES—*Heirs—Estoppel.*—If an heir, in consideration of concessions made him by the other heirs and administratrix, agree not to object to payment by her of just claims presented by another heir, though barred by the statute of limitations, he will be estopped from excepting to her account on the ground that she improperly paid them.

4. IDEM—*Credit—Statute of limitations.*—Code 1873, ch. 128, § 7, provides that administrator shall have no credit for a claim which he pays, knowing the facts whereby recovery could be prevented, does not require him to plead the statute of limitations to a claim apparently barred, where he knows facts making the statute inapplicable.

5. ACCOUNTS CURRENT—*Accounts stated—Statute of limitations.*—Where before the bar of the statute of limitations has attached to accounts current, they are presented to debtor, and are converted into an account stated, the statute of limitations begins to run against them only from the date of such conversion.

6. CHANCERY PRACTICE—*Depositions—When read—Case at bar.*—Where a cause has been submitted for hearing, in vacation, at a day not later than a specified day to be fixed by further agreement, depositions taken

and returned after such submission, and before the day fixed for the hearing, may be read.

7. WITNESSES—*Competency—Husband.*—Husband of distributee is incompetent to testify in a suit involving the settlement of the estate wherein wife is interested.

8. IDEM—*Distributee—Release.*—Distributee party to the suit, who has released administratrix from liability as such, is competent to testify in her behalf on questions affecting her liability.

9. CHANCERY PRACTICE.—*Second answer.*—Defendant, for whom in his absence his counsel may have filed an incomplete, irregular and unsworn answer (which is, in fact, no answer at all), may file a full and complete answer at any time before a final decree.

10. IDEM—*Continuance.*—Where parties have been diligent in their efforts to be ready for trial, but have been prevented by circumstances beyond their control, the court should grant them a continuance.

Appeal from decree of circuit court of Pulaski county, rendered March 20, 1884, in the creditors' suit pending in said court under the style of "*Fowlkes' Executor and others* v. *Radford's Administratrix and heirs,*" to settle the administration of the estate of her intestate, Dr. John B. Radford, and sell his lands to pay his debts. A partial settlement of the accounts of the administratrix had been taken, returned and confirmed May 20th, 1878, and Wm. T. Yancey and his wife, Mary McC. Yancey, who was one of the daughters and heirs and distributees of the intestate, filed their petition March 18th, 1881, seeking to surcharge and falsify said settlement, and praying that their petition be considered and treated as their answer to the original bill, and also as their cross-bill, and that said decree of confirmation be reheard and reversed, and the cause recommitted to the master for resettlement of said accounts. To this petition and cross-bill, the administratrix and G. C. Wharton, a creditor of the estate and the husband of Nannie R. Wharton, who was another of said daughters, heirs and distributees, filed their answers. Depositions were taken. The circuit court by its decree that is here complained of, reversed the decree of confirmation and recommitted the cause to the master for resettlement of said accounts. From this decree, the administratrix, who

was Mrs. E. C. Radford the widow of the intestate, and said G. C. Wharton appealed to this court. Opinion states the case.

*G. W. & L. C. Hansbrough,* and *Waller R. Staples,* for appellants.

*James A. Walker,* and *I. C. Larew,* for appellees.

RICHARDSON, J., delivered the opinion of the court.

Dr. John B. Radford died on the 1st of July, 1872, intestate, leaving a widow, Mrs. E. C. Radford, and three daughters, the wives of G. C. Wharton, R. H. Adams, and William T. Yancey, respectively, and one son, J. L. Radford, and seized and possessed of a large estate, real and personal, and owing numerous debts, but greatly less in the aggregate than the value of the estate of which he died possessed.

In August, 1872, the widow qualified as administratrix, and proceeded to administer the estate. In February, 1877, Fowlkes' executor and others instituted this, a creditors' suit, against the administratrix and heirs and others to have a settlement of the administration accounts, and to subject so much of the real estate as might be necessary to the payment of debts. Such proceedings were had that an account was ordered in May, 1877. The account was accordingly taken and the master returned his report thereof on the 30th of April, 1878, showing the receipts and disbursements by the administratrix to the 15th of April of that year. And at that time, as appears by said report, the receipts charged amounted to $20,480.82 principal and $5,658.48 interest, and the disbursements credited amounted to $20,970.37 principal and $5,879.43 interest, showing a balance then due the administratrix of $489.55 principal and $220.95 interest. And by the same report the balance of debts remaining unpaid, as of said 15th of April, 1878, amounted to $11,849.08 principal, and $5,597.40 interest, and $17.06 costs, making a total

remaining indebtedness of $17,463.55. Several creditors in the meantime came in by petition and were made parties, and the consequence was that said total remaining indebtedness was increased to $18,110.14, as shown by a supplemental report of 22d March, 1880. The aforesaid account of receipts and disbursements was, as reported, duly confirmed by a decree in the cause rendered on the 20th of May, 1879, without exceptions thereto. On the petition of the administratrix, filed in the cause on the 18th of March, 1881, a further account was ordered of receipts and disbursements other than those embraced in said settled, reported and confirmed accounts. The master proceeded to make another settlement, and on the 15th of November returned his report, by which it appeared that the master, instead of pursuing the decretal directions and confining himself to receipts and disbursements not embraced in said confirmed settlement, proceeded, in effect, to reverse said former settlement, and made it appear that the administratrix was indebted to the estate, as of the 15th day of April, 1878, in the sum of $1,615.43 principal, and $1,215.45 interest. This is known in the record as Commissioner Wade's last report, the former confirmed report having also been made by him. This "last report" was assailed by numerous exceptions by W. T. Yancey and wife on the one hand, and the administratrix on the other, and the latter, among other things, excepted on the ground that the report was not authorized by the decree under which it purported to have been made; and so obviously well taken was this exception, that at the hearing the exception was sustained, and properly so. From the commencement of this suit Mrs. Radford, in her own right and as administratrix, as well as the heirs at-law and distributees of the intestate, including Yancey and wife, were parties defendant and regularly served with process; but neither of them appeared or answered, it being conceded by all that the personalty was inadequate to the payment of the debts, and that the realty would have to be resorted to; and this being the object of the suit, it was seemingly acquiesced in by the heirs

and distributees as the shortest and cheapest way to pay the debts, and at the same time settle and distribute the estate.

Yet, on the 18th May, 1881, after all this lapse of time and acquiescence, and long after the decree of confirmation aforesaid, Yancey and wife filed their petition in the cause, praying for a rehearing of said decree of confirmation, and proposing to surcharge and falsify said settled, reported and confirmed amounts in numerous particulars set forth in their petition, and that said petition be taken and treated as their answer to the original bill, and also as a cross-bill.

In the absence of Mrs. Radford and G. C. Wharton, caused by sickness, their counsel was forced to file mere formal, incomplete, unsigned and unsworn answers for both of them.    Subsequently, in the circuit court of Montgomery county, where this suit was originally brought and was then pending, Mrs. Radford, by leave of court, filed her demurrer and regular, full and sworn answer to the petition and cross-bill of Yancey and wife, in lieu of the former mere formal answer filed by her counsel.

The cause was then removed to the circuit court of Pulaski county.    Mrs. Radford, administratrix, by reason of age and infirm health, entrusted the active duties touching the administration to her son-in-law and chosen agent, G. C. Wharton.    It was against the administratrix and her said agent that the petition of Yancey and wife, with its alleged grounds of surcharge and falsification, was aimed, though Wharton was more prominently made the object of assault.    He continued to be detained from home by the sickness of himself and wife, and was thus kept from getting ready for trial; so when the case was first called for trial in the circuit court of Pulaski, Mrs. Radford moved for and obtained a continuance, doubtless because she could not prepare for trial in the absence of her said agent, which absence was enforced by sickness.    When Wharton was able to return to Virginia, his home, he proceeded to get ready to make the necessary defense, but it so happened that, by rea-

son of the prevalence of small-pox at Salem, where his counsel resided, and consequent quarantine regulations and interruption of communication along the line of railway where the suit was pending and where the necessary witnesses resided, together with the protracted sickness of a material witness, and for other reasons, was not ready at the next term to go to trial; and on the calling of the cause then, he asked leave to file his regular and sworn answer in lieu of the mere formal,. incomplete, unsworn answer theretofore put in for him as aforesaid; but it was excepted to—first, because it came too late; and, second, because he had already answered. Then (the exceptions to his answer not having been passed upon) he moved for a continuance, and supported the motion with his affidavit, setting forth the facts above stated, showing that he was not and could not have been ready for trial at that time by reason of circumstances beyond his control. But the court overruled the motion for continuance; and thereupon the parties agreed to, and the court entered an order submitting the cause to be " heard and decided " in vacation, at Wytheville, not later than the 1st day of February, 1884, with the privilege to counsel on both sides to argue the same either orally or in writing, as they might elect. This order of submission was made at the October term, 1883, and as the cause was to be heard not later than the 1st of February, 1884, or on some day prior thereto, there was a period of over three months in which, it would seem, the parties were at liberty to prepare for trial.

In the meantime, numerous depositions had been taken by both parties, and on behalf of the defendants, the said administratrix and G. C. Wharton, others were taken after said order of submission, and they were on that ground excepted to ; others previously taken were excepted to on the ground that the defendants were incompetent witnesses in the cause. At the hearing these depositions had been returned and were before the judge when he heard and decided the cause. By the decree rendered both classes of exceptions were sustained and the depo-

sitions rejected ; and the court further decreed that said claim of confirmation of 20th May, 1879, be reheard, and then proceeded to decree that same, so far as it confirmed the settled accounts of Mrs. E. C. Radford, as administratrix of J. B. Radford, deceased, be reversed and set aside, and that said account be referred for resettlement. From this decree the administratrix and G. C. Wharton obtained an appeal and *supersedeas*.

Practically, the sole question for decision by this court is, whether the circuit court erred in its decree of 20th of March, 1884, in rehearing and in reversing and annulling the previous decree of 20th of May, 1879, in so far as the latter decree confirmed the settled and reported accounts of Mrs. E. C. Radford to the 15th of April, 1878, which accounts had been settled and reported in obedience to a former decree rendered in the cause, and were so confirmed without exceptions thereto. But the question thus presented involves the consideration and decision of several preliminary questions of practice raised by the record, and which are relied upon by the appellants as grounds of reversal.

I. The first objection is to the action of the circuit court at the October term, 1883, in refusing the motion of the administratrix and G. C. Wharton for a continuance.

We are clearly of opinion that this assignment is well taken. The cause, it is true, had been continued at the last preceding term on the motion of the administratrix. But the matters involved were numerous, obscure and complicated, requiring time and patient investigation. Moreover, the sickness of Mrs. Radford, the administratrix, and consequent enforced inability to give her prompt personal attention to the matters in dispute, touching the settlement of her administration accounts, the enforced absence, in the city of New York, of G. C. Wharton by reason of the sickness of himself and wife, it is obvious was the cause why the case was not ready for hearing before the spring term, 1883, at which time a continuance was had on the motion of the administratrix. And from the affidavit of G. C.

Wharton, the substance of which has been set forth in the statement of the case, it is equally clear that the prevalence of small-pox and consequent quarantine regulations along the line of railway where the parties, their counsel and witnesses resided, together with the personal sickness of parties, or of sickness in the families of counsel, or of witnesses, from time to time, between the March term, 1883, and the October term of the same year, rendered it practically impossible for Mrs. Radford and G. C. Wharton to finish taking their depositions and be ready for trial at the latter term, at which the motion for continuance in question was twice made, and each time supported by the proper affidavit, but was both times refused. Mrs. Radford and G. C. Wharton (the appellants) appear to have been diligent in their efforts to be ready for trial, but were prevented by circumstances beyond their control; and as no unreasonable delay had occurred, and justice demanded that they should have every reasonable opportunity of making their defense, the court should have granted the motion as essential to justice.

II. The second assignment of error is to the action of the circuit court in sustaining the exceptions to the second answer of G. C. Wharton and rejecting same at the hearing.

We are of opinion that this objection, too, is well taken. The answer thus rejected was the full, complete and sworn answer of said Wharton, and was offered in lieu of the irregular, incomplete and unsworn answer prepared by his counsel during his enforced absence in the city of New York, as already stated. Under somewhat similar circumstances a like mere formal answer was at the same time filed by counsel for Mrs. Radford, and she was afterwards permitted to file her regular, full and sworn answer. It is difficult to conceive why G. C. Wharton should be denied the same privilege, and especially in view of the fact that our statute, § 35, ch. 167, Code 1873 (the law in force) provides that a defendant *may* file his answer "at any time before a final decree." The word "may," as used in this statute, is mandatory and means "*must.*" *Bowles* v. *Woodson,*

6 Gratt. 81; *Bean* v. *Simmons,* 9 Gratt. 391; *Preston* v. *Heiskell,* 32 Gratt. 48.

In *Bowles* v. *Woodson* this court said, in construing a similar provision in the act of 7th of March, 1826 (Sup. Rev. Code, p. 130), that "a defendant in chancery, though in default for want of an answer, ought to be permitted to file any proper answer at any time before a final decree, but that the trial of the cause is not to be consequently delayed unless for good cause shown, or unless the plaintiff should elect to continue it or remand it to the rules; and, therefore, that the circuit court erred in over-ruling the appellant's motion for leave to file his answer to the appellee's bill, and consequently in proceeding to hear and decide the cause without an answer." And so, in *Bean* v. *Simmons, supra,* this court said: "And considering the subject to which the power conferred by the proviso in question of allowing an answer to be filed, notwithstanding the expiration of the four months (or two months) after *subpœna* served, and that it involves what may be considered the natural right of every defendant in a cause to make his defense, the court has no hesitation in saying that the term 'may' in this proviso is imperative, and to be construed as meaning 'must' or 'shall,' and that the court has no discretion to refuse to permit an answer to be filed when tendered within the time limited by the act, if otherwise proper to be received."

It is not pretended that the answer tendered and refused in this case was not in form and substance a proper answer. Indeed, it was objected to solely upon the grounds—first, that it was too late; and, second, that Wharton had already filed his answer. The provision of the Code, above referred to, is a complete answer to the first objection; and as to the second, it is only necessary to say that the irregular, incomplete. and unsworn paper put in by counsel under the stress of circumstances before referred to, was, in part, no answer, and when the regular, full and complete answer was offered, it should have been received, especially as the party so offering to answer had not

contributed to delay the cause, and offered his answer, not only before a final decree, but before the rendition of the decree complained of, which, though settling material principles, was yet but an interlocutory decree. Indeed, the unsworn writings (so called answers) previously put in by counsel for the administratrix and G. C. Wharton, respectively, were not *answers in chancery* at all; for they not only did not make full and proper defense for the parties in whose names they purported to be filed, but they were put in in their absence, without their knowledge, were incomplete and irregular, and were not sworn to. Without the proper affidavit, the answer will not meet the plaintiff's purposes of discovery, nor the defendant's purposes of defense. The doctrine above stated in respect to a defendant's right to file his answer at any time before a final decree does not, of course, apply to the case of an amended or supplemental answer in general, for in such case a regular sworn answer is already in. Hence, in 4th Minor's Inst. (old ed. 1194), it is said: "In respect to the *amendment of answers* it is to be observed that, as answers are verified by the *respondent's oath,* an amendment of them (as is the case also with pleas which are sworn to) is, for obvious reasons, not easily admitted. In mere matters of form, or mistakes of dates, or verbal inaccuracies, which the court is satisfied have occurred through inadvertance, there is considerable indulgence in allowing amendments; but in respect to material facts, or where it is sought to change es sentially the grounds of defense taken in the original answer, amendments are admitted with great reluctance." The doctrine thus laid down is founded upon the idea that as both the original and the amended answer are verified by the respondent's oath, he should be restrained from changes in his sworn statements with the design of evading the justice of the cause by setting up new and ingeniously contrived defenses. In the case in hand, of course, there is no such difficulty in the way; for, as has been shown, the original, mere formal paper was really no answer; and the objection that the regular, sworn answer,

which was offered and rejected, was obnoxious to the rule with respect to *amendments,* is wholly without pertinency.

III. It is objected that the circuit court erred in rejecting the depositions of G. C. Wharton and A. A. Phlegar, taken on behalf of the defendants at Bangs in January, 1884, solely upon the ground that they were taken after the decree of October, 1883, submitting the cause for decision in vacation.

We are of opinion that this objection, too, is well taken. Ordinarily, when a cause is by agreement of parties submitted for decision in vacation without more, it would be irregular and inadmissible, as tending to surprise and confusion, to permit any party to proceed to take further evidence. But this case was not so submitted. On the contrary, it was submitted to be *heard* and decided in vacation, *not later* than a day named in the decree, and with leave to counsel to argue orally or in writing. It follows that the time of hearing had to be fixed by agreement of counsel; and the very terms of the order of submission strongly indicate that each party should proceed to get ready for a hearing and decision at some day not later than that specified in the order of submission, the terms of which make it fairly open to such a construction; otherwise why did opposing counsel attend on the taking of these depositions and carefully and at length cross-examine the witnesses, when, if the terms of the order of submission debarred the defendants from the right to take them, they had only to keep away instead of responding, as they did, by their presence and active participation in the taking of the depositions. Indeed, when we look to the terms of the order submitting the cause for *hearing and decision* in vacation, we see but little, if any, difference in its practical effect and the not unfrequent occurrence of continuing a cause, during term, to a later day of the same term, or to a special term set for the purpose, or even the next regular term, as the object in each case is to promote the ends of justice by enabling the parties to get ready for trial; for in either case it is a matter resting in the sound discretion of the court, looking

to all the surrounding circumstances, whether depositions taken in the meantime shall or shall not be received and read at the hearing. These depositions were regularly taken and returned before the day set for the hearing, and were in the hands of the judge when the cause was heard and decided. Moreover, under all the circumstances, and especially in view of the harsh ruling on the previous motion for a continuance, made by these defendants at the time at which the order of submission was made, the rejection of these depositions seems directly in the teeth of § 36, ch. 172, Code 1873, by which it is declared that "in a suit in equity a deposition may be read, if returned before the hearing of the cause, or after an interlocutory decree if it be as to a matter not thereby adjudged and be returned before final decree." See also 2d Bart. Chy. Pr. 737-8. It cannot be pretended that the depositions in question were not taken and returned before, not only a final, but before the interlocutory decree complained of. It is, therefore, clear that the circuit court erred in rejecting them.

IV. It is assigned for error that the circuit court decided that G. C. Wharton, R. H. Adams and J. L. Radford were not competent witnesses to testify as to any contract made by the appellant, Mrs. E. C. Radford, and said Yancey and others in reference to the matters in dispute in this suit, and so deciding, excluded their depositions.

The depositions of the persons named were taken on behalf of the administratrix (Mrs. Radford) and G. C. Wharton. They were excepted to, the exception sustained and the depositions rejected. William T. Yancey also gave his deposition on behalf of himself and wife; and the defendants excepted on the ground that he was incompetent, and the court sustained the exceptions and rejected his deposition also. The question, then, is, did the circuit court err in these rulings or either of them? In order to a proper solution of this question it is essential to make a brief preliminary statement showing the relations of the parties contestant to each other and to the questions at issue.

The intestate, J. B. Radford, held at his death a large and valuable estate, real and personal, the real estate consisting in the main of two valuable tracts of land on opposite sides of New river, in the counties of Montgomery and Pulaski, respectively. He lived and died on the Montgomery estate, which was conveyed to him and his wife jointly by John McC. Taylor, the father of the female grantee. The conveyance was made in February, 1842, prior to the statute affecting the doctrine of survivorship; and 'J. B. Radford having died in 1872, this Montgomery estate became the sole property in fee of Mrs. Radford by survivorship. At his death, the Pulaski estate was held and owned by J. B. Radford in his own right in fee. He owned other lands, of comparatively small value, in his own right. The appellant, G. C. Wharton, lived on part of the Montgomery or home tract, and had been put in possession thereof by Dr. Radford in his life-time; and for some years before the death of the latter, G. C. Wharton was engaged in the mercantile and milling business, in both of which capacities Dr. Radford dealt with him in getting supplies for his family and farming operations. In addition, G. C. Wharton had a considerable personal account against Dr. Radford for money paid for him during his life, and for his estate after his death, the several accounts amounting to $8,134.65 principal, and $3,535.81 interest. Some years before the commencement of these transactions between Dr. Radford and G. C. Wharton, the former sold to one Gilliam a certain tract of finely timbered land for $10,000, for which Gilliam executed four bonds to Dr. Radford for $2,500 each. This was prior to the war. After the war, Gilliam having in the meantime taken most of the valuable timber from the land, and having made considerable payments, but being unable to pay the balance due, the contract was cancelled, and by an arrangement between him, Dr. Radford and G. C. Wharton, the latter became the owner of about half the land, formerly sold to Gilliam, at the price of $5,000, for which he executed his two bonds to Dr. Radford for $2,500 each; and in the dealings

above referred to between Dr. Radford and G. C. Wharton it was agreed and understood that the former should credit the two bonds of the latter, for $2,500 each, with the store and mill account aforesaid.

At the sale of the personalty of the intestate, Mrs. Radford made considerable purchases, amounting probably to about what would have been her distributive share, and doubtless with the general understanding that she would so hold it; but it turned out that the personalty was largely inadequate to the payment of debts of the estate, and, of course, this expectation was abandoned.

The creditors, however, were making no trouble, for they knew that a comparatively small portion of the real estate together with, or even without the personalty, was amply sufficient to pay their debts.

But, in his lifetime, Dr. Radford had put his sons in-law and their respective wives, his daughters, in possession and permitted them to live upon and enjoy certain portions of the lands held by him. The land thus occupied and enjoyed by his son-in-law Yancey and his wife, was part of the Pulaski tract, before referred to, which was owned by Dr. Radford in his own right. After the death of Dr. Radford, William T. Yancey and wife became solicitous that Mrs. Radford and the other heirs should join in conveying to them that portion of the Pulaski land in their possession, and in which Mrs. Radford was entitled to dower. Several conferences were consequently had between the widow and heirs touching this and other matters necessary to a prompt and amicable settlement of the estate, the payment of its debts and apportionment of the realty, remaining after the sale of enough thereof to finish paying the debts, among Mrs. Wharton, Mrs. Adams, J. L. Radford and Mrs. Yancey, as and for their respective shares, they being Dr. Radford's only heirs. Finally it was verbally agreed and understood between them that the lands in possession of the several heirs should be valued and so much from each parcel sold as would be necessary, to-

gether with the personalty, to pay the debts, keeping in view equality of contribution by the several heirs; that Mrs. Radford should release her right of dower in the land occupied by Yancey and wife, and that she (Mrs. Radford), Wharton and wife, Adams and wife, and J. L. Radford should join in conveying said portion of land, free from all dower or other claims on their part, to Yancey and wife and to the heirs of the latter; that Yancey and wife and the other heirs should confirm and acquiesce in the settlement of the accounts of receipts and disbursements by Mrs. Radford as administratrix to 15th of April, 1878, which account had been taken, returned and filed in obedience to a decree in this suit; that neither Yancey and wife nor the other heirs should interpose the statute of limitations to any item of disbursement embraced in such settlement; that Mrs. Radford should not, in a final settlement between her and the heirs and distributees, be charged with any property bought or retained by her at the sales of the personalty belonging to the estate of decedent, her husband.

In pursuance of this verbal agreement and understanding, commissioners were chosen by the parties to value the lands in the possession of the heirs respectively, and to ascertain the advancements made to them in money and personal property by Dr. Radford in his life time, and they performed the duties assigned them and returned their report in writing.

Some of the parties, especially Yancey and wife, seem not to have been satisfied with the report thus made, and sought an adjustment more to their liking. Accordingly, on the 16th day of May, 1879, the widow and heirs and distributees of Dr. Radford met at Christiansburg, the county seat of Montgomery county, where was then, as now, situated the courthouse and clerk's offices of said county, where this suit was brought and was then being prosecuted, and where the said report of the settled accounts of receipts and disbursements of the administratrix, to 15th April, 1878, was then on file, and had been since the 30th of April, 1878, a period of over one year, and said

parties then and there entered into a written agreement, which, on its face, purports to have been entered into in order to provide for the payment of the debts due by Dr. Radford's estate, and a final settlement thereof, as well as a division of the real estate among themselves. This written agreement thus entered into at Christiansburg was signed by W. T. Yancey and wife, G. C. Wharton and wife, R. H. Adams and wife, J. L. Radford, and Mrs. E. C. Radford, widow of Dr. J. B. Radford, deceased. It distinctly sets forth that the " money and assets " *then* in the hands of the administratrix, and thereafter to come into her hands, would be insufficient to pay the debts of the estate then remaining unpaid, which debts were " estimated to amount to about twelve thousand dollars, and that it would be necessary to sell portions of the real estate to pay the debts before a final and equal division of said estate could be made." Then the agreement proceeds: " In order to accomplish these before-named purposes, to wit: the payment of the debts of the estate and an equal division of the same between and among the several parties aforesaid, it is hereby agreed, as a basis of a final settlement, that the valuation of the several tracts now in possession of the said heirs and distributees, respectively, shall be fixed on a basis as follows, to-wit: that in possession of James L. Radford, thirteen thousand dollars; that in possession of R. H. Adams and Lizzie C., his wife, valued bottom lands at ninety dollars per acre, upland at *thirty* dollars per acre, less one thousand dollars, as agreed by said parties to be taken from said tract so valued to Adams and wife, in consideration of certain *bluff* lands included in the portion laid off to them as aforesaid; that in possession of G. C. Wharton and Nannie R., his wife, valued at eleven thousand dollars; that in possession of William T. Yancey, Jr., and Mary McC., his wife, valued the bottom land at one hundred dollars per acre and the uplands at thirty dollars per acre, less one thousand dollars, as agreed by the said parties to be taken from the said tract so valued to the said Yancey and wife, in consideration of certain bluff lands

included in the portion laid off to them as aforesaid—the quantity of the tracts of said Adams and wife and said Yancey and wife, and the relative portion of bottom and uplands to be ascertained by survey."

And the agreement further provided that enough land should be sold from the said several tracts as that the proceeds of such sales should be sufficient to pay off the balance of the debts due by the estate, after applying the personal property and all other assets in the hands of the administratrix thereto, having respect to the value of the lands respectively in the hands of the parties aforesaid, and with the view of producing entire equality between said parties. Then the agreement sets forth in detail how the portion to be sold from each tract, for payment of debts, shall be ascertained, how the proceeds shall be applied, and provides for private sales, but, if not sold privately, then for public sales. And then the agreement concludes: "It is further agreed that the said heirs and distributees of the said John B. Radford, deceased, other than Yancey and wife, shall unite in making a deed to said Yancey and wife, and for the proportion of said sums so in their possession as aforesaid, with similar covenants and grants as set forth in a paper purporting to be a deed from said John B. Radford and Elizabeth C., his wife, to G. C. Wharton and Nannie R., his wife, of record in clerk's office of the county of Montgomery, and make a similar deed to said Adams and wife, with the exception as to the right of dower of Mrs. E. C. Radford, widow of said John B. Radford, deceased, in said tract of land so in possession of the said Adams and wife as aforesaid, and a similar deed to G. C. Wharton and wife, to supply a defect in the paper aforesaid, executed by said John B. Radford and Elizabeth C., his wife, and execute a deed to James L. Radford in fee simple for the portion of land aforesaid in his possession." And then the agreement concludes: "The said Mrs. E. C. Radford agrees on her part to unite in said deeds and relinquish her dower in the several tracts aforesaid to the several parties aforesaid, except as to said R. H. Adams and wife, she

hereby reserves her right of dower as the widow of said J. B. Radford, deceased, in the said tract of land in posseseion of the said Adams and wife. And it is further agreed by the said several heirs, as aforesaid, of the said John B. Radford, deceased, that in consideration of one dollar, the receipt of which is hereby acknowledged, and the further consideration of her undertakings and agreements in this paper that we hereby relinquish all rights, title and claim in and to the tract of land deeded to J. B. Radford and Elizabeth C., his wife, and her heirs forever by her father, John McC. Taylor, supposed to contain about seven hundred and fifty acres, lying in the county of Montgomery, on New river."

By this agreement, entered into at Christiansburg on the 16th of May, 1879, the land matters were adjusted to the satisfaction of all the heirs and distributees. Matters seemed to move smoothly on, and in the meantime, it having been ascertained what portion was to be sold from each tract for the payment of debts, and how much each of the heirs was entitled to after the payment of the debts of the estate remaining unpaid, the heirs and distributees, other than Yancey and wife, were ready and willing to convey to each other as stipulated in said written agreement; but at this juncture it seems to have come to the knowledge of the heirs and distributees, other than Yancey and wife, that the latter, or rather Yancey himself, disavowed the obligation to abide the verbal agreement aforesaid, by which the heirs were, among other things, to acquiesce in the settlement of Mrs. Radford's account, as administratrix, to 15th April, 1878, reported and confirmed as aforesaid, and were not to interpose the statute of limitations to any item of disbursement therein contained; and learning that Yancey was disposed not to admit or abide by such verbal agreement, the widow and other heirs hesitated and for awhile refused to convey to Yancey and wife, as stipulated in said written agreement, until he would obligate himself in writing to keep said verbal agreement. Accordingly, a written agreement, dated 20th of April,

1880, was drawn up providing, in substance, that the heirs were to acquiesce in said settled accounts of receipts and disbursements and were not to interpose the statute of limitations to any item of disbursement therein embraced. This agreement was signed by the heirs, other than Yancey and wife. The question of the statute of limitations referred mainly, if not entirely, to the store and mill accounts made by Dr. Radford in his life-time with his son-in-law, G. C. Wharton, and which were paid by Mrs. Radford as admininistratrix, which will presently be more particularly referred to.

Yancey was still solicitous for a conveyance to himself and wife of the land of which they were in possession. He was asked to sign the agreement of April 20th, 1880, which had been signed by all the other heirs, and thus obligate himself to acquiesce in said settled and confirmed report of receipts and disbursements as aforesaid, in accordance with the said verbal agreement and understanding between them. He refused to sign it, but said that if the charges in the accounts of G. C. Wharton against the estate were the usual charges and not exorbitant, he was entitled to have them paid, and that he had not intended, and did not intend, to plead the statute of limitations thereto. Relying upon these statements made by Yancey, and the settlement in question having then been long confirmed, the other heirs, though with some reluctance and apprehension that Yancey might involve them in trouble, finally joined Mrs. Radford and conveyed to Yancey and wife, by deed dated 7th day of August, 1880, two hundred and forty two acres of land by metes and bounds, it being part of the Radford estate in the county of Pulaski, which Dr. Radford at his death owned in fee; and Mrs. Radford, by said conveyance, relinquished her claim to dower in the land so conveyed.

In the face of all these facts, Yancey and wife, on the 18th of May, 1881—over one year after they had received the conveyance to them as aforesaid, and about two years after the decree of 20th May, 1879, confirming the account of receipts

and disbursements of the administratrix to the 15th of April, 1878, filed their petition in the cause to surcharge and falsify said confirmed accounts of the administratrix, and asked that said petition be taken and treated as their answer to the original bill and also as a cross-bill; and, from the proceedings had subsequent to the filing of the petition, it is obvious that it was so taken and considered.

In the light of these facts the question recurs, did the court below err in rejecting at the hearing the deposition of Wm. T. Yancey, and those of R. H. Adams, J. L. Radford and G. C. Wharton?

As to Wm. T. Yancey, who deposed on behalf of himself and wife, and who was objected to by the defendants as an incompetent witness, it is clear that the court did not err in rejecting his deposition. His wife, Mrs. Mary McC. Yancey, was one of intestate's heirs-at-law, and as such interested in the balance for or against the estate in the settlement of the administration accounts. For, whatever it may be worth, the other heirs and distributees had executed to Mrs. Radford, administratrix, a release from all liability on account of disbursements made by her; but neither Yancey nor his wife had executed such release, and they alone, of all the heirs and creditors, were assailing the settled administration accounts, which had been confirmed by said decree of May 20th, 1879. It is therefore obvious that Wm. T. Yancey could not depose in this cause without giving evidence for or against his wife, and this it was not competent for him to do, either at common law or under chapter 172, Code 1873. *Warwick* v. *Warwick*, 31 Gratt. 70. His deposition was therefore properly rejected.

As to J. L. Radford, who was one of the heirs-at-law of the intestate, who deposed at the instance and on behalf of the defendants in the cross-bill, and who was objected to as an incompetent witness by the plaintiffs therein, Yancey and wife, it is equally clear that the circuit court did err in rejecting his deposition. It is true he was a party to the record, and was

examined on behalf of the administratrix touching the issues then pending. But what were those issues? They were nothing other than those raised by the petition of Yancey and wife, which was treated as a cross-bill, and they were all involved in the one enquiry, did the grounds of surcharge and falsification suggested warrant the circuit court, under all the circumstances, in rehearing the decree of confirmation of May 20th, 1879? The real controversy was between Yancey and wife on the one hand, and Mrs. Radford, the administratrix, on the other, and the sole question was as to the validity of the settlement of her accounts as administratrix, which had been duly made, reported and confirmed. The deponent, J. L. Radford, was, as to the question thus at issue, only a nominal party. There was no controversy between him and Yancey and wife—the real controversy being, as already stated, between Yancey and wife and the administratrix. He had, moreover, joined in the release to Mrs. Radford, the administratrix, and was therefore a competent witness under the common law rule. For at common law the competency of a witness, disqualified by interest, may always be *restored by* a proper *release.* 1 Green. on Ev. § 426; *Reynolds* v. *Calloway,* 31 Gratt. 436. Then, as J. L. Radford was clearly competent at common law, it follows that he was not rendered incompetent by our statute (§§ 21 and 22, ch. 172, Code of 1873), and that statute was made to widen, and not to narrow the field of competency. See *Reynolds* v. *Calloway, supra.* Nor could the intestate's death nor the incompetency, under the circumstances of this case, affect the competency of this deponent to testify touching the subject of controversy.

As to the competency of G. C. Wharton and R. H. Adams, whose wives were respectively heirs-at-law of the intestate and parties to this suit, it is a question involved in serious doubt; but as their depositions, given on behalf of the administratrix, are not necessary to a proper decision of this case, we decline to decide whether or not their depositions were properly rejected by the court below.

This brings us to the consideration of the main question to be decided, which is, did the circuit court err in its decree of 20th March, 1884, in rehearing, reversing and annulling the former decree of confirmation of May 20th, 1879, in so far as the latter confirms the report of the settlement of the administration accounts of Mrs. E. C. Radford, administratrix of J. B. Radford, deceased?

It is not pretended that the settlement in question was a full and final settlement by the administratrix of all matters touching her administration. On the contrary, it is, as it purports to be, only an account of receipts and disbursements by her to the 15th of April, 1878. That account was taken, stated and reported in obedience to a decree rendered in the original suit of Fowlkes' executors and others against the administratrix, widow and heirs of J. B. Radford, deceased, and was regularly confirmed by the decree therein of 20th May, 1879, during all which time Yancey and wife were parties defendant, and made no objection to the settlement, and it was reported and confirmed without exception thereto.

What is the effect of a settlement thus made, reported and confirmed? The answer is simple and easy, and is found in the statute, § 29, ch. 128, Code 1873, which provides that the *ex parte* settlement by a master commissioner of the accounts of a fiduciary, to the extent that the same shall be confirmed by the court to which it is properly returned, shall be taken to be correct, except so far as the same may, in a suit in proper time, be surcharged and falsified. And Mr. Barton says: "This was regarded as the effect of an *ex parte* settlement even before the statute, and although an account formally stated in pursuance of a decree of court in a suit *inter partes* and confirmed by the court, is not even *prima facie* evidence against persons who were not parties to the suit, or in privity with any party thereto" —citing 4 Minor's Inst. 1232; *Robertson* v. *Wright*, 17 Gratt. 534; *Newton* v. *Poole*, 12 Leigh, 112.

In the last named case Tucker, P., said: "It has long been

the established rule of our courts, that settlement of administration accounts made by auditors appointed by the courts of probate, when duly returned, approved and recorded, are admissible evidence for the executor, and are to be taken as *prima facie* evidence of the several charges and credits, subject to be surcharged and falsified by any person interested. The decisions to that effect (cited at the bar) rest mainly upon the long established practice of the country, and are somewhat sustained by the principles, that where the law entrusts the performance of certain duties to commissioners, it will be presumed they have properly fulfilled them till the contrary is proved. * * * * It is not, therefore, enough to show that there has been no inventory ; or that great errors appear, or that the executor has even taken an unfair advantage; for, though such evidence unquestionably would affect the general result, and forbid us to take the *account* reported to be just, yet so long as the commissioners are unassailed, the verity of their certificate of the proof of the items of the account must be allowed, unless controverted by evidence. For the audited account does not, as has been erroneously supposed, stand upon the footing of a *stated account* between the parties. The latter rests upon the supposed adjustment between the parties themselves ; and if these be found, it is of course void *in toto*. The other rests upon the supposed integrity of an impartial tribunal, and is only to be corrected so far as it is proved to be erroneous, unless corruption in the tribunal itself can be established ; for where the law authorizes any person to make an enquiry of a judicial, nature, and to register the proceedings, the proceedings so registered are not only to be presumed to be true, but they are generally held to be the only legitimate medium to prove the result." The same doctrine was announced by Staples, J., in *Leake's Ex'or* v. *Leake,* 75 Va. 792, and in numerous later decisions by this court. And in *Wimbush* v. *Rawlins' Ex'or,* 76 Va. 48, Anderson, J., delivering the opinion of this court, said: " These settlements were properly taken to be *prima facie* correct, and

the *onus* was on the plaintiffs to repel that presumption, by showing that they were not correct. It was not sufficient to allege surcharge and falsification, but it was necessary to prove their allegations."

As applicable to the case in hand and like cases, the sum of all these authorities is that, although the audited account is not conclusive evidence against those not parties to it to establish the amount and justice of the fiduciary disbursements, yet, whether the settlement in question be an *ex parte* settlement or one made under a decree in a suit *inter partes*, the fact whether a particular item was proved by a proper voucher, or whether all the items were proved by vouchers, depends upon the certified report of the settlement made by the commissioner lawfully authorized to make it, and must, therefore, be taken as true until disproved; and when such settlement is made in a suit *inter partes*, and is duly returned and confirmed by a decree rendered in the cause, it acquires the character of finality, and cannot be disturbed except for error apparent or after-discovered matter.

In the light of these principles, and of the facts disclosed by the evidence, we are clearly of opinion that the court below erred in its said decree of 20th March, 1884, in reversing and annulling so much of the former decree of May 20th, 1879, as confirmed the report of the settlement of the accounts of the administratrix to the 15th of April, 1878, as embraced in the report returned on the 30th day of that month, and in directing a resettlement of said accounts.

By the first settlement made by Commissioner Wade, which is the one in question, the administratrix was charged with the full amount of sale bills of the personalty and with debts due the estate, aggregating, as of April 15th, 1878, the sum of $20,480.82 principal, and $5,658.48 interest, and she was credited with disbursements, as of same date, amounting to $20,970.37 principal, and $5,879.43 interest, showing a balance due the administratrix on said 15th of April, 1878, of $489.55 principal, and $220.95 interest. And by said settlement, so

reported and confirmed, the balance of debts then remaining
due and unpaid amounted to $11,849.08 principal, and $5,597.40
interest, and $17.06 costs, making a total of $17,463.55 ; which
total, by a subsequent report of March 22d, 1880, was increased
to $18,110.14. This report, thus resulting in the increase of the
estate's indebtedness, was made by Commissioner Wade in obe-
dience to a decree in the original suit entered in response to the
petition of the administratrix, filed May 18th, 1881, represent-
ing that some important items of her administration account
were omitted from the account theretofore reported by Commis-
sioner Wade, and confirmed as aforesaid, from the want of proper
vouchers at the time of said former settlement, and for other
reasons, and that since said former settlement there had been
additional receipts and disbursements by her, and praying that,
inasmuch as she was precluded by this suit, in which she was
required to settle her accounts, from having *ex parte* settlements
thereof before one of the court's commissioners, the cause to be
recommitted for an account of said omitted items and additional
receipts and disbursements.

On the same day of the filing of this petition by the admin-
istratrix, Yancey and wife filed their petition to rehear and
reverse the said decree of confirmation and to surcharge and
falsify the settlement thereby confirmed. And thus commenced
the present litigation, which is confined to Yancey and wife on
the one hand, and the appellants on the other. The creditors
are in no way interested, nor are they taking any part, as such
of them as are not already paid are amply secured by a fund
subject to the control of the court in the original suit.

In their petition, and in their exceptions to the reported and
confirmed settlement which is assailed, Yancey and wife specify
about *one hundred items* for surcharge and falsification. The
alleged grounds of objection are extremely vague and indefinite
in the main. In some cases it is, that the administratrix is
charged with a named sum, when she should have been charged
with more, not designating the sum ; in most cases the speci-

fication is, that the administratrix has been credited by dis-
bursements either without vouchers or upon insufficient vouchers.
Such specifications can hardly be held sufficient to fairly notify
the other party who is called upon to maintain the validity of
the settlement. In 4th Minor's Inst., at p. 1233, it is said: "A
bill to surcharge and falsify an *ex parte* settlement must specify
the particulars wherein it is supposed to be erroneous." We have
seen that the rule cannot be relaxed in the case of a settlement
made, reported and confirmed in a suit *inter partes*. But aside
from this, the report of settlement is the commissioner's certifi-
cate to the court of the correctness of the settlement. If the
vouchers referred to cannot be produced they will be presumed
to have existed, although if produced the plaintiff may counter-
act their force and effect; but in any such case the burden of
proof is on the plaintiff and no change can be made in the
accounts except on satisfactory evidence, and this rule is adhered
to with special strictness when there has been considerable lapse
of time. 2 Bart. Chy. Pr. 716. And, as we have seen, the
statute (§ 29, ch. 128, Code 1873) provides that the settlement of
the accounts of a fiduciary, made by a master commissioner in
chancery, and confirmed by the court, shall be taken to be cor-
rect, except so far as the same may, in a suit in *proper time*, be
surcharged and falsified. 1st Bart. Chy. Pr. 119.

Of all the items specified by Yancey and wife as subject to be
surcharged or falsified, there is not a particle of evidence to
sustain the charge as to any one of them. On the other hand,
administratrix, in her answer, not only specifically denies each
and every allegation in the cross-bill, but she, *ex gratia,* furnishes
evidence in support of nearly every item of her account that is
assailed. The cross-bill specifies the items to be surcharged or
falsified, and calls upon the administratrix to answer, and she
answers under oath denying each allegation. In the absence of
proof to the contrary, and none is adduced, her answer is con-
clusive of the case in her favor. And not only does she deny
explicitly each and every allegation of surcharge and falsifica-

tion, but she states affirmatively matter relating directly to the items of her account sought to be invalidated, and explains the circumstances relied on by her as showing their validity. In such a case the allegations of the answer, though affirmative, must be taken as true. *Corbin* v. *Mills*, 19 Gratt. 466; *Morris* v. *Grubb*, 23 Gratt. 342; *Bell and wife* v. *Moon*, 79 Va. 341. And in 4th Minor's Inst., at p. 1233, it is said: "A bill to surcharge and falsify an *ex parte* settlement must specify the particulars wherein it is supposed to be erroneous. And if the answer to the bill discloses nothing improper in the account, and the complainant exhibits *no evidence* to sustain his allegations, the bill should be dismissed." See also *Wyllis* v. *Venable*, 4 Munf. 369; *Lee* v. *Stuart*, 2 Leigh, 76; *Garrett* v. *Carr*, 3 Leigh, 407; *Shugart* v. *Thompson*, 10 Leigh, 443–4; *Corbin* v. *Mills, supra.*

Of all the items excepted to there is but one which, on its face, even remotely indicates any irregularity, and that is made up of the store account, the mill account and the individual account of G. C. Wharton. These accounts aggregate $8,134.65 principal and $3,536.81 interest; the grounds of objection to their payment by the administratrix being that they were allowed as credits to the administratrix upon insufficient proof, and were barred by the statute of limitations.

In respect to those items the administratrix in her answer says: "That her intestate, John B. Radford, died 30th June, 1872, and she qualified as his administratrix in July, 1872, and proceeded at once to administer on the estate; that among other claims against the estate that were presented to and audited by her was the account of G. C. Wharton for store goods furnished during the life-time of the intestate to the amount of $3,813.89 principal and $582.44 interest up to January 1st, 1873, and the account of said Wharton for money and other things paid and furnished during intestate's life-time to the amount of $4,320.66 principal. And this respondent being satisfied that these accounts were just and lawful and susceptible of proof, *she allowed*

*and settled them,* and she denies that they were barred by the statute of limitations when they were so audited and allowed and settled by her. It is true a considerable portion, but not all, of the store account had been contracted more than two years; and a considerable portion, but not all, of the other account had been contracted more than five years before the sums were presented to and audited and settled by her; but then, these *accounts* had been *annually stated* by and between the parties thereto during the life-time of the intestate, and thus kept in force and unbarred by the statute of limitations at the time they were; that these accounts were settled partly by surrendering to G. C. Wharton his two notes, each for $2,500, given the intestate for land purchased of him, * * * the accounts having been contracted with the understanding between the parties that they were to go so far as necessary to pay said land notes. Respondent being satisfied of the correctness and law- fulness of the accounts, and of the propriety of carrying out the understanding of the parties as to the application of the said notes towards the payment thereof, deemed it unnecessary and improper to require a resort to suit for the settlement thereof; and she denies that the account was for the first time audited by the commissioner and allowed by him, but asserts that the commissioner only stated that account, approving the disburse- ments made by her for the estate; yet she avers and believes that, even at this remote period, the statement of these accounts between the parties may, and if deemed essential, can still be established by proof."

Thus the administratrix not only explicitly denies the allega- tion that these accounts were barred by the statute when pre- sented and settled by her, but she makes affirmative allegations directly connected therewith, and explaining why they were not barred, why they were lawful and just charges against the estate of her intestate, and why she settled them. And these averments are fully sustained by proof, the exceptors, on the other hand, failing to offer any proof to the contrary. These

affirmative averments, in the absence of proof to the contrary, are evidence for the administratrix and, under the circumstances, conclusive in her favor; and when the direct proof of these averments is superadded, as is the case, there can be no doubt of the fact that the administratrix was properly credited with these items in the account of her disbursements.

But it is insisted that the allowance of credit to the administratrix for these items is error on the face of the report, and that section 7, of chapter 128, Code of 1873, debars her from the right to have credit for these items. But the section referred to only provides that where a personal representative pays a debt *knowing* the facts whereby the recovery thereof might have been prevented, as by failure of consideration, lapse of time, or otherwise, he shall be allowed no credit therefor.

It does not necessarily follow that because an account, even when first presented for payment, seems on its face to be barred, must be presumed to be so barred. And surely no such presumption could exist in the face of the proof adduced by the administratrix in this case—first, of the verity attributed to her settled and confirmed accounts until disproved; and, second, the direct proof of the validity of the items in question.

We know of no case—certainly none in Virginia—which has gone to the extent of holding, outright, that in every case where a debt is seemingly barred it is the duty of the personal representative to plead the statute, for he may be possessed (as was the case here) of knowledge and information which satisfies him of the justice and legality of the claim and makes it his duty to pay it, and not involve the estate in useless litigation and costs.

*Smith* v. *Pattie*, 81 Va. 654, though a case in which the duty of an administrator to interpose the statute of limitations in every proper case, is by no means applicable to the state of facts here presented. In that case the administrator was the sole heir and distributee of his intestate, and there was a judgment against him individually which attached to the intestate's estate

as soon as it descended upon his said heir and distributee, and there were debts against the intestate which were barred by the statute of limitations; and it was held that the administrator could not (as he attempted to do) revive these debts and repel the bar by any promise in writing or otherwise, but was bound to plead the statute against these debts, and he refusing or failing so to do, it was the right of the judgment creditor, by reason of his interest in the fund, to interpose the plea, as he did by an exception to the commissioner's report. And in that case it was said that " no estate is lawfully administered where the personal representative has neglected or failed to make any defense of which the decedent, if living, could have availed himself." In that case there was no question as to the application of the statute, and the intestate, if living, could have successfully relied upon the bar of the statute. Here, however, the statute could not have been successfully pleaded by the intestate had he been alive.

Moreover, the rule, though strongly laid down in *Smith* v. *Pattie,* is subject to a qualification therein recognized in quoting with approbation from *Tunstall* v. *Pollard,* 11 Leigh, 1, where Tucker, J., said: "I incline to think an executor is always bound to make this defense—that is, the statute of limitations—unless it be waived by those who are interested." This remark of Judge Tucker correctly states the law of this case, and is in no respect inconsistent with either the spirit or letter of the decision in *Smith* v. *Pattie.* Here it is clearly in proof that, for a consideration—the consideration of relinquishment of dower by Mrs. Radford—in the land conveyed to Yancey and wife, and in consideration of other concessions made by her and the other heirs and distributees to them (Yancey and wife) they would acquiesce in the settled administration accounts, and would not interpose the statute of limitations to these accounts of G. C. Wharton, which the administratrix had recognized as just and lawful, and had settled.

Now, though a party to the suit in which this administration

account was settled, reported and confirmed; though the report of said settlement was on file for more than one year, and was confirmed without exception, Yancey feigns ignorance as to the character of that settlement, and seeks to excuse himself on the ground that he had gone to or was living in Lynchburg, and in business there, and, therefore, not cognizant of what was being done in the suit. No such pretext can avail him; he was regularly a party to the suit in which the settlement was ordered, made, reported and confirmed, and in the absence of corruption on the part of the commissioner, or something from which falsehood or unfairness on his part can be inferred (and there is no pretense of anything of the kind in this case) the settlement is presumed to be correct in every particular, and, until the contrary be established, in the regular way, it will as effectually bind Yancey and wife as if he had been personally present during the taking of the account, and had also been personally present in court and acquiescing in its confirmation.

His plea of absence and want of information can avail him nothing. He was present, as is clearly proved, when time after time these matters were discussed, and when he and the other heirs finally agreed that these accounts of G. C. Wharton should be paid by the administratrix, he (Yancey) and his wife to have a conveyance of the land of which they were in possession, or their rightful share thereof, with a relinquishment of dower by Mrs. Radford. And it is a conspicuous fact that he was present at Christiansburg on the 16th of May, 1879, just four days previous to the confirmation of this settlement, when he and the other heirs and distributees, including Mrs. Radford, entered into the written agreement of that date, by which Mrs. Radford became bound to convey to Yancey and wife their share of the land, after selling ratably enough to pay the debts, with relinquishment of dower, and by which agreement, among other things, the debts of the estate then remaining unpaid were estimated at "about $12,000." Is it credible that this estimate was or could have been made without knowledge of or reference to

the settlement, then on file at Christiansburg? We think not. By the settlement the principal of the debts then remaining unpaid amounted to near the sum of $12,000, but with the interest accrued to a much larger sum. But, as we have seen, the administratrix had, after the report and confirmation of this settlement, by her petition filed in the cause, set forth that certain items of disbursements had been omitted from that settlement for want of proper vouchers at the time and for other causes, and that there had been subsequent receipts and disbursements by her, as to which she asked for a further account. The inference, then, is almost irresistible that the estimate of $12,000, as the remaining indebtedness, could only have been arrived at by comparing the settled account and the items of disbursement omitted therefrom and the subsequent receipts and disbursements with the whole indebtedness as ascertained.

If this be not so, then Yancey was guilty of the absurd folly of guessing at the amount of the remaining indebtedness of the estate and consenting to the sale of a ratable share of the land of which he was in possession, for the payment of that indebtedness. The idea of the want of knowledge or information on the part of Yancey is too absurd to be entertained for a moment.

There is yet another view as respects the validity of the payment of these Wharton accounts, which is also conclusive of the matter in favor of the administratrix. In her answer to the cross-bill she alleges that these accounts, when settled by her, were not barred, and that the account current was annually presented by Wharton or his agents, and was thus converted into an account stated, which obviated the statutory bar of two years applicable to retail store accounts. And this averment is fully sustained by competent evidence.

In discussing this subject, after calling attention to section 8, ch. 164, Code 1873, which provides that every action to recover money for articles charged in *any store account* shall be brought within *two years,* Mr. Minor, 4 Insts. 721, says: That "the statute contemplates—1st. *Retail* store accounts only. (*Tom-*

*lin* v. *Kelly,* 1 Wash. 190; *Wortham & Co.* v. *Smith and als.* 15 Gratt. 487, 492–3, 496–7.) 2d. That the promise is *implied* merely from the *making of the account,* and is *not express;* the limitation upon every express promise (not under seal) being *five years.* (*Beale* v. *Edmondson,* 3 Call, 514; *Brooke* v. *Shelby,* 4th H. & M. 266.)

And he says: "It has been thought by some, inasmuch as the statute requires a promise to take the case out of the statute to be *in writing,* etc. (§ 10, ch. 146, Code 1873), that such express promise will not suffice if it be *by parol* only; but this view omits to consider the fact that the limitation is applicable only to *implied promises,* and not to such as are express; and that the express promise merges the implied agreeably to the maxim, *expressum facit cessare tacitum.* (2 Th. Co. Tit. 57–'8, 241; Broom's Max. 505.) Moreover, if this idea should prevail, a promissory note, or even a bond taken for such store account, would be barred by the *lapse of two years;* that is, by the same time as the original cause of action (V. C. 1873, c. 146, § 10), which would be inconvenient and, as it seems, absurd." This doctrine is consistent with the doctrine that a new promise makes a new cause of action. Hence in *Toland* v. *Sprague,* 13 Peters, 300, it is said: "When the account becomes stated, then the statute of limitations begins to run." "An account stated is an agreement that all the items in the account are correct." *Oil Co.* v. *Van Etten,* 17 Otto, 333–4; *Union Bank* v. *Knapp,* 15 Am. Dec. 190. "Acknowledgment of a debt made before the statute had run postpones the running of the statute to the time of the acknowledgment." *Austin* v. *Bostwick,* 25 Am. Dec. 42–3. "When an account is made up and rendered, the party receiving it is bound to examine it. If he admits it to be correct, it becomes a stated account, and binding on both parties. So, also, if he neither admits nor makes objection within a reasonable time, this silence will be construed into acquiescence in its justness, and it becomes as binding as a stated account. *London* v. *Roan,* 41 Am. Dec. 60. See, also, 2 Green. on Ev. § 127, where

it is said: "The original form, or evidence of the debt, is of no importance under the count upon an *account stated;* for the stating of the account alters the nature of the debt, and is in the nature of a new promise or understanding." And see, also, *Townes* v. *Birchett,* 12 Leigh, 177; *Robertson* v. *Wright,* 17 Gratt. 5–34.

The rule announced in these decisions is founded on good sense and justice, and the *principle* of the rule is, that the retention of the account, after its rendition, for an unreasonable time without objection, is evidence of acquiescence in its justice, and throws the burden of proof upon the party so acquiescing. In any view that may be taken, touching the application of the statute of limitations, it is clear that the intestate, if living when the Wharton accounts were settled, could not have successfully relied upon the statute of limitations; nor, in the light of the facts disclosed by the evidence, could his administratrix have done so, nor was she called upon in the lawful administration of her intestate's estate to make the effort.

Taken all in all, there was nothing to authorize the rehearing of the decree of confirmation of 20th May, 1879; and when at the hearing no evidence had been adduced by the exceptors to sustain any allegation of surcharge or falsification made by them, and the administratrix had taken upon herself the burden of sustaining by evidence nearly every item of her accounts that was assailed, surely it was the duty of the court to dismiss the petition which was treated also as a cross-bill.

Nor is there anything disclosed by the record which can justly cast a shadow of suspicion over the actions and doings of the administratrix or her son-in-law and *factotum,* G. C. Wharton. Mrs. Radford's conduct, both as administratrix and as a just and affectionate mother, is marked by considerate kindness to all her children, and especially was she kind and even generous to her son-in-law, W. T. Yancey. The debts proved were the debts of Dr. Radford and were chargeable against his estate only. The land of which Yancey was in possession was a part of the

Pulaski estate called Rockford, and was owned by Dr. Radford in his own right. The Montgomery or home estate was conveyed to Dr. Radford and his wife by the father of the latter, and by right of survivorship Mrs. Radford became the sole owner thereof in fee. Had Mrs. Radford been disposed to act illiberally towards Yancey and wife, she had it completely in her power to exclude them from any considerable share in the estate. She could, after exhausting the personalty, have taken her dower in "Rockford," and had that estate subjected to the payment of Dr. Radford's debts. This would have left but little of that estate for distribution among the heirs, and the balance, whatever it might have been, would have been liable to distribution among all the heirs; and this would have made the share of Yancey and wife extremely small, if anything. This effected, Mrs. Radford could have disposed of her own Montgomery estate to her other children, or to whomsoever she pleased, and thus have effectually excluded Yancey and wife. But this she did not do. On the contrary, with a mother's affection and sense of justice towards all her children, she seems to have treated her own estate and that of her deceased husband as a common property—first for the payment of *his* debts, and then for just distribution among all *their* children.

In the face of these facts, and after Mrs. Radford had conveyed to Yancey and wife the portion of "Rockford" to which, by the written agreement of May 16th, 1879, they were entitled, and with relinquishment of dower, Yancey comes clamoring for *more,* and, to give color to his demand, alleges grounds of surcharge and falsification of her accounts as administratrix, which imputes to her and her chosen agent, G. C. Wharton, highly improper and unworthy conduct and motives. But not one of these allegations is sustained by evidence, nor is there anything on the face of the accounts calculated to give even plausibility to the charges. From the filing of the original bill it was a fact conceded on all hands that the intestate's personalty was inadequate to the payment of the debts, and that the lands would

have to be resorted to. It was so alleged in the bill, and Yancey and wife, who were regularly made defendants thereto, never questioned the fact until the filing of their petition, five years after. And now, strange to say, it is alleged in the petition, and relied on as a sufficient excuse, that the exceptors had no knowledge of the alleged errors in the settlement. It is sufficient to say they had the means of knowledge and information,.and are necessarily held to a knowledge of all that the proper use of those means would have afforded. Indeed, upon well settled principles, under the peculiar circumstances of this case, they stand precluded upon the doctrine of *laches* and acquiescence. It is clearly in proof that Yancey not only knew of the manner of the settlement of the administration account in question, but acquiesced therein by express agreement between him and the other heirs, and for a consideration. *Quoad* the creditors, the agreement to release Mrs. Radford from liability, as administratrix, as to personalty bought or retained by her, and as to disbursements made by her, the agreement was worthless. But the creditors were either paid or were secure, and they made no objection, and as between the heirs and distributees, all of whom were of age and capable of acting, the agreement was valid and binding.

It is apparent that the contention of Yancey is aimed mainly, if not entirely, at G. C. Wharton, whom Mrs. Radford, by reason of her own age and infirmity, selected as her active agent in administering the estate. It does not appear that a more proper selection could have been made. But be this as it may,. Wharton was a creditor of the estate and, as such, entitled to what it owed him. And Yancey, in effect, sanctioned the justness of Wharton's accounts by agreeing that they should be paid, if the charges were not exhorbitant (and it is not pretended that they were so), and by agreeing not to attempt to interpose the statute of limitations. But. now, so it is, all these things have ceased to have a lodgment in slipping memory, and the administratrix

and her chosen agent are made to bear the brunt of this needless and unjustifiable litigation.

We are clearly of opinion that the decree appealed from is, in the respects indicated in this opinion, erroneous, and should be reversed and annulled, and a decree entered here dismissing the petition and cross-bill of Yancey and wife, and in all other respects affirming said decree, and remanding the cause for further proceedings to be had therein.

DECREE REVERSED IN PART AND AFFIRMED IN PART.